1  Martin E. Rosen (108998), mrosen@bargerwolen.com
   Robert K. Renner (155283), rrenner@bargerwolen.com
2  BARGER & WOLEN LLP
   19800 MacArthur Boulevard, 8th Floor
3  Irvine, California  92612
   Telephone:  (949) 757-2800
4  Facsimile:  (949) 752-6313

5  Attorneys for Defendant
   The Lincoln National Life Insurance Company
6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11  GILBERT GOODMAN, M.D.,              )  CASE NO.:
                                        )
12              Plaintiff,              )  **DEFENDANT THE LINCOLN**
                                        )  **NATIONAL LIFE INSURANCE**
13        vs.                           )  **COMPANY'S NOTICE OF**
                                        )  **REMOVAL PURSUANT TO 28**
14  THE LINCOLN NATIONAL LIFE           )  **U.S.C. §§ 1441(b) AND 1446;**
    INSURANCE COMPANY; and DOES         )  **DECLARATION OF BARBARA**
15  1 through 10, inclusive,            )  **TRUE**
                                        )
16              Defendants.             )  (Diversity Jurisdiction)
                                        )
17  _____ )  Complaint Filed: September 29, 2011

18

19

20

21

22

23

24

25

26

27

28

BARGER & WOLEN LLP
19800 MACARTHUR BLVD.
EIGHTH FLOOR
IRVINE, CA 92612
(949) 757-2800

1 TO THE HONORABLE COURT, TO THE PLAINTIFF AND TO HIS
2 ATTORNEYS OF RECORD:

3

4 PLEASE TAKE NOTICE that Defendant The Lincoln National Life Insurance
5 Company ("Lincoln National") hereby seeks removal of civil action, Case No. 30-
6 2011-00511956, from the Superior Court of the State of California for the County of
7 Orange to the United States District Court for the Central District of California.
8 Removal of this action is proper for the following reasons:

9

10 ## ALL DEFENDANTS REMOVING

11 1. Lincoln National is the only non-fictitious named defendant in the civil
12 action filed on September 29, 2011 in the Orange County Superior Court, entitled
13 *GILBERT GOODMAN, M.D., Plaintiff, v. THE LINCOLN NATIONAL LIFE*
14 *INSURANCE COMPANY, and DOES 1 through 10, inclusive, Defendants.*" A true
15 and correct copy of the Summons and Complaint is attached hereto as part of Exhibit
16 "A."

17

18 2. All other defendants named in this action are fictitiously named and need
19 not be considered for purposes of removal. 28 U.S.C. § 1441(a). Therefore, no
20 joinder is necessary.

21

22 ## TIMELINESS

23 3. Lincoln National was served with the Summons and Complaint on
24 October 6, 2011. The removal is therefore timely under 28 U.S.C. § 1446(b) in that
25 removal is sought within 30 days after service of the Summons and Complaint.

26

27

28

1

## JURISDICTION

2    4.    The case is a civil action over which this Court has jurisdiction under the

3 provisions of 28 U.S.C. § 1332, and it is one which may be removed to this Court

4 pursuant to the provisions of 28 U.S.C. § 1441(b), in that it is a civil action between

5 citizens of different states and the amount in controversy exceeds the sum of $75,000,

6 exclusive of interest and costs, as set forth more fully below.[1]

7

8

## JURISDICTIONAL AMOUNT

9    5.    The amount in controversy in this action exceeds $75,000. Plaintiff

10 Gilbert Goodman, M.D. ("Plaintiff") seeks judgment against Lincoln National for,

11 among other things, disability benefits allegedly due to him based upon Disability

12 Income Policy Number 000010125650 ("Policy") issued by Lincoln National.

13 Although Plaintiff's Complaint refers to and/or purports to summarize various terms

14 of the Policy, he chose not to attach a copy to his pleading.  Nevertheless, Lincoln

15 National attaches a true and correct copy of the Policy to this Notice as Exhibit "B"

16 and incorporates it herein by reference.

17

18    6.    Unfortunately, Plaintiff's summary of the Policy benefit provisions is

19 erroneous, because he itemizes only the "base" benefit, whereas he also elected to

20 purchase and did purchase additional "buy-up" benefits.  As will be shown, the

21 minimum jurisdictional amount is satisfied.

22

23

24

25

26    [1] As set forth in its concurrently filed Answer, Lincoln National submits that the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1001 *et seq.*, as amended, may apply to Plaintiff's underlying disability claim and, hence, this litigation.  If true, federal question jurisdiction also exists, as an alternative basis justifying removal.  However, at this time, Lincoln National lacks sufficient facts to confirm ERISA's application.

27

28

7. As set forth in his Complaint, Plaintiff alleges that Lincoln National wrongfully denied his claim for disability benefits, and he accordingly seeks damages based upon the monthly benefit of $2,000 for the maximum benefit period of 24 months. (*See* Complaint at ¶¶ 2 and 6.) Thus, under Plaintiff's analysis, disability benefits totaling $48,000.00 are at issue.

8. However, as set forth in the Policy's Schedule of Benefits for Class 3 Members (Plaintiff practiced internal medicine), the gross monthly amount for Plaintiff's Buy-Up Benefit would be $5,040.65 (60% of his monthly salary of $8,401.08). (*See* Exhibit "B" at page 3-5; Complaint at ¶ 9; and the accompanying Declaration of Barbara True ("True Declaration"), ¶ 2.) Moreover, because he was 63 years of age on his claimed date of disability, the Policy's Schedule of Benefits confirms that he would otherwise be eligible for benefits for 36 months. (*Id.*) Therefore, taking into account Plaintiff's receipt of State Disability Insurance benefits in the monthly amount of $4,277.00 for the one-year period between September 13, 2010 and September 12, 2011, Lincoln National calculates disability benefits totaling $142,970.40.[2] (*See* True Declaration, ¶ 3.)

9. Finally, under applicable Ninth Circuit authority, Lincoln National is not required to prove in *absolute terms* that more than $75,000 is at issue. Rather, a "defendant must provide evidence establishing that it is 'more likely than not' that the amount in controversy exceeds" $75,000. *Sanchez v. Monumental Life Ins. Co.,* 102 F.3d 398, 404 (9th Cir. 1996). As demonstrated above, the preponderance of the evidence standard is clearly met in this case. Therefore, removal is proper.

---

[2] Using the present value of the future benefits reduces the amount in controversy by approximately $7,200, *i.e.*, from more than $142,000 to more than $135,000.

1

## CITIZENSHIP

2      10.    As alleged in the Complaint, Plaintiff is, and at all relevant times herein
3 was, a resident and citizen of the State of California at the time of the filing of the
4 Complaint. (*See* Exhibit A, ¶ 3.) As correctly alleged in the Complaint, Lincoln
5 National is, and at all relevant times herein was, an insurance company incorporated
6 in the State of Indiana. (*See id.* at ¶ 4.) Although not alleged in the Complaint,
7 Lincoln National's principal place of business is also in Indiana, specifically Fort
8 Wayne.[3] Therefore, complete diversity exists between the parties.

9

10

## PROCESS

11     11.    True and correct copies of all process, pleadings and orders served upon
12 Lincoln National in the Superior Court are attached hereto as Exhibit "A." A true and
13 correct copy of the answer filed by Lincoln National in the Superior Court is attached
14 hereto as Exhibit "C."

15

16     12.    On the same day this Notice of Removal was filed, a copy of this Notice
17 of Removal was filed with the Clerk of the Orange County Superior Court.

18

19        WHEREFORE, Lincoln National prays that the above action pending in the
20 Orange County Superior Court be removed from that court to this Court.

21

22

23

24

25

26

27

---

28   [3] *See* attached True Declaration, ¶ 4.

1  Dated: November 3, 2011                    BARGER & WOLEN LLP

2

3                                              By:
                                                  MARTIN E. ROSEN
4                                                 ROBERT K. RENNER
                                                  Attorneys for Defendant
5                                                 The Lincoln National Life
                                                  Insurance Company
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF BARBARA TRUE

I, Barbara True, hereby declare as follows:

1.     I am the Assistant Vice President, Risk Services, for The Lincoln National Life Insurance Company ("Lincoln National"), the defendant in this action. Based upon my position and based upon records kept in the ordinary course of Lincoln National's business, I have personal knowledge of the matters set forth below, and -- if called to testify -- could and would competently testify as follows:

2.     At issue in this case is Plaintiff Gilbert Goodman, M.D.'s ("Plaintiff") disability income coverage provided by way of Lincoln National's Policy Number 00010125650 ("Policy"), a true and correct copy of which is attached as Exhibit "B" to this Notice of Removal. Under the Policy's Schedule of Benefits for Class 3 Members (Plaintiff practiced internal medicine), the gross monthly amount for Plaintiff's Buy-Up Benefit would be $5,040.65 (60% of his monthly salary of $8,401.08). Because he was 63 years of age on his claimed date of disability, the Policy's Schedule of Benefits confirms that he would otherwise be eligible for benefits for a maximum of 36 months.

3.     Taking into account Plaintiff's receipt of State Disability Insurance benefits in the monthly amount of $4,277.00 for the one-year period between September 13, 2010 and September 12, 2011, Lincoln National calculates disability benefits of up to $142,970.40 at issue in this case.

4.     As correctly alleged in Plaintiff's Complaint, Lincoln National is an insurance company organized and existing under and by virtue of the laws of the

ple

State of Indiana. In addition, Lincoln National has a principal place of business in Fort Wayne, Indiana.

I declare under penalty of perjury under the laws of the United States of America, the State of California and the State of Nebraska that the foregoing is true and correct.

Executed this 3rd day of November, 2011 at Omaha, Nebraska.

Barbara J. True

# EXHIBIT A

# COPY

MICHAEL B. HORROW (SBN 162917)
DONAHUE & HORROW, LLP
1960 E. Grand Ave., Suite 1215
El Segundo, California 90245
Telephone: (310) 322-0300
Facsimile: (310) 322-0302
Email: mhorrow@donahuehorrow.com

Attorney for Plaintiff
GILBERT GOODMAN M.D.

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

SEP 29 2011

ALAN CARLSON, Clerk of the Court

BY_____F. IBARRA_____DEPUTY

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA

### FOR THE COUNTY OF ORANGE

30-2011

| | |
|---|---|
| GILBERT GOODMAN, M.D., | Case No.: **00511956** |
| Plaintiff, | COMPLAINT & JURY DEMAND |
| vs. | 1) Breach of the Duty of Good Faith and Fair Dealing; |
| THE LINCOLN NATIONAL LIFE INSURANCE COMPANY; and, DOES 1 through 10, inclusive, | 2) Breach of Contract |
| Defendant | |

# BY FAX

JUDGE SHEILA FELL
DEPT. C22

Plaintiff alleges as follows:

## GENERAL ALLEGATIONS

### INTRODUCTION

1.    Prior to his disability, Plaintiff, GILBERT GOODMAN, M.D. ("DR. GOODMAN"), was a physician Board Certified by the American Board of Internal Medicine. In 1998, DR. GOODMAN suffered a fall which resulted in a fractured coccyx. This set off a long history of significant pain despite surgeries, injections and medications. Ultimately, the treatments failed and DR. GOODMAN filed for disability as of September 2010.

2.    Sadly, despite significant medical evidence supportive of disability, THE LINCOLN NATIONAL LIFE INSURANCE COMPANY ("LINCOLN NATIONAL") has failed to honor the terms of the lifetime benefits provision.

**DONAHUE & HORROW, LLP**

**DONAHUE & HORROW, LLP**

## FACTUAL SUMMARY

3.   Plaintiff is, and at all relevant times was, a resident and citizen of the State of California.

4.   Plaintiff alleges upon information and belief that the Defendant, THE LINCOLN NATIONAL LIFE INSURANCE COMPANY, is, and at all relevant times was, a corporation duly organized and existing under and by virtue of the laws of the State of Indiana, and authorized to transact and transacting the business of insurance in this state.

5.   The true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants, DOES 1 through 10, are unknown to plaintiff who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes and on such information and belief alleges that each of the Defendants sued herein as a DOE is legally responsible in some manner for the events and happenings referred to herein, and will ask leave of this court to amend this complaint to insert their true names and capacities in place and instead of the fictitious names when the same become known to plaintiff.

6.   On or about April 1, 2010, Defendant LINCOLN NATIONAL issued Disability Income Policy #000010125650 to DR. GOODMAN. According to the terms of the Policy, if DR. GOODMAN became totally disabled, LINCOLN NATIONAL promised to pay him a base monthly benefit of $2000, after a 90 day Elimination Period for a maximum of 24 months in benefits.

7.   The Policy defines "Total Disability" or "Totally Disabled" as: "during the elimination period and maximum benefit period, an Insured Employee is unable (1) to perform all of the main duties of his or her specialty in the practice of medicine on a full-time basis; (2) because of a disability which is caused by injury or sickness and started while the Employee was insured."

8.   Plaintiff has paid all premiums due under the Policies to Defendant at all relevant times and has performed all of his obligations under the Policies.

9.   Prior to his disability, DR. GOODMAN was in private practice as a Board Certified Internal Medicine physician.

10.   In or about 1998, DR. GOODMAN suffered a fractured coccyx due to a fall.

11.   On or about November 16, 2001, DR. GOODMAN underwent a distal coccyx excision due to the prior coccyx fracture.

12.   Despite the surgical intervention, DR. GOODMAN's pain never completely resolved.

13.   On or about August 25, 2004, DR. GOODMAN consulted with P. Douglas Kiester, MD

Case No:                                         – 2 –

COMPLAINT & JURY DEMAND

regarding his ongoing symptoms:

- "The patient states his symptoms never completely resolved. He has difficulty sitting longer than 15 minutes. He has had injections which have not helped him significantly and he presents now for a second opinion as to what his options might be."

14. On or about June 8, 2005, DR. GOODMAN consulted with Mark Spoonamore, MD, an orthopedic surgeon due to his ongoing complaints of coccygeal pain.

15. On or about February 13, 2008, DR. GOODMAN consulted with Dr. Anita Gregory, a rectal surgeon:

- "60 yr old male internist. S/p I & D in office and fistulotomy in OR 11/21."
- "Constant DC and anal incontinence- since; Daily pain & mucous; occ blood and stool staining."
- "c/o pt anal pain- severe."

16. On or about September 10, 2008, DR. GOODMAN followed up with Dr. Anita Gregory:

- "Continues to be debilitated by anal pain- constant, severe. Only goes to work then home- in bed."

17. On or about January 14, 2009, DR. GOODMAN was admitted to St. Joseph Hospital due to an anal fistula:

- "This is a 61 yr old male physician who underwent incision and drainage of a perianal abscess in another physician's office in November 2007. He was subsequently taken to the operating room on November 21, 2007 where an anal fistulotomy was performed. The patient states he has had constant anal discharge since that time. He notes daily anal pain and mucus. He notes occasional blood and stool staining."
- "The patient was initially evaluated by me in February 2009. At that time, he was noted to have significant distortion of the anal margin with right-sided fistula tract and a prolapsed hemorrhoid at this level."
- "The patient returned several months later stating he continued to be debilitated by anal pain, which was constant and severe. He could not participate in any normal social activities."
- "The patient is now admitted for examination under anesthesia, anal fistulotomy and/or anal

DONAHUE & HORROW, LLP

1            flap procedure and excision of prolapsed hemorrhoid."

2        18.    On or about March 11, 2009, DR. GOODMAN followed up with Dr. Anita Gregory. DR.

3   GOODMAN reported continuing "deep, severe pain- unable to sit."

4        19.    On or about April 29, 2009, DR. GOODMAN established treatment with Dr. Brian Boyd, a

5   pain management specialist. DR. GOODMAN presented with the following complaints:

6         •    "The patient notes he had surgery in November of 2007 by Dr. Ng. He had one week relief

7            of incontinence, but apparently the sphincter was cut."

8         •    "In January of 2009, he had a hemorrhoidectomy and had scar tissue removed. He noted

9            that it helped with local tenderness but there is still a deep pain with a clinical concern

10           regarding neuroma. Incontinence is treated with a pad. Pain starts at the surgical site and

11           spreads deep. It is described as burning and sharp. It was knife-like before. Average pain

12           is 5/10 and peaks at 8 to 9/10. He notes exacerbating factors of sitting with a 10-minute

13           limit. He notes this condition impacts on his activity. He comes home and just goes to

               bed."

14        20.    On or about June 10, 2009, DR. GOODMAN followed up with Dr. Boyd and reported

15   "rectal pain is a lot worse."

16        21.    On or about September 30, 2009, DR. GOODMAN underwent a consultation with Dr. Anita

17   Gregory. DR. GOODMAN reported continued incontinence and treatment with a pain management

18   and psychiatrist to deal with his ongoing pain and depression complaints.

19        22.    On or about April 28, 2010, DR. GOODMAN underwent an EMG and NCV due to

20   increasing burning and tingling in his legs. The findings were consistent with mild to moderate

21   neuropathy.

22        23.    By September 13, 2010, DR. GOODMAN's pain continued despite all treatments and he

23   reluctantly sought the assistance of his disability insurance carrier while trying to assess whether he

24   would ever return to his beloved career.

25        24.    On or about September 15, 2010, DR. GOODMAN's treating physician, Ronald Daoud,

26   M.D. prepared a report confirming DR. GOODMAN's treatment and disability:

27         •    "Dr. Gilbert Goodman has been under my care since January 2009. His initial illness began

28            with a rectal fistula for which he had surgery in November 2007. Post-operatively Dr.

DONAHUE & HORROW, LLP

Goodman became incontinent of stool and experienced increasing perineal pain. A rectal ultrasound revealed a severed internal anal sphincter."

- "Over the next year he began experiencing increasingly severe pain which spread from the perineal area into his legs and into his feet. This has been accompanied by increasingly severe muscle fasciculations. A nerve conduction test revealed a patchy motor sensory neuropathy. Extensive workup for etiology was unrevealing and the final diagnosis is one of idiopathic peripheral neuropathy."

- "Dr. Goodman has been followed closely with me by Dr. Brian Boyd, a Board Certified Neurologist/Pain Medicine specialist. Dr. Goodman has had numerous trials of medications to help him with the pain and fasciculations, all of which have caused intolerable side effects."

- "Dr. Goodman's pain has reached levels of 7 or 8 on a 10 scale. We are trying to very slowly titrate him up on Lyrica, starting at very small doses. In the meantime he is needing to take 3 to 4 tramadol per day, Klonopin at night to control the fasciculations, and he urges liquid Morphine sulphate for breakthrough pain. A trial of Methadone resulted in a flaccid bladder and urine retention."

- "Due to the level of pain and some mental clouding with the current medications Dr. Goodman is unable to perform any of his duties as a primary care Internist as of September 13, 2010. In all likelihood this will be a permanent disability."

25.   On or about September 22, 2010, Dr. Ronald Daoud completed a Long Term Disability Claim Physician's Statement confirming Plaintiff's disability as of September 13, 2010 due to severe intractable pain and fecal incontinence.

26.   On or about April 22, 2011, Dr. Ronald Daoud prepared a report to Lincoln National following his review of LINCOLN NATIONAL's medical review by Wayne Anderson, MD:

- "To be quite frank, Dr. Anderson's analysis of Dr. Goodman's case is quite inaccurate, deficient and incomplete; and his conclusions are therefore necessarily false and off the mark. To conclude that Dr. Goodman is not disabled does a great injustice to Dr. Goodman."

- "First of all, Dr. Anderson completely neglects to even mention one of Dr. Goodman's

DONAHUE & HORROW, LLP

DONAHUE & HORROW, LLP

major problems, which is the severe perineal pain from which he has been suffering for a number of years. The perineal pain has had several components, none of which are addressed by Dr. Anderson."

- "Dr. Goodman had, in 1999, fractured his coccyx (tailbone). He consulted with an orthopedic surgeon, Dr. Steven Dennis, who eventually performed surgery to completely remove the coccyx, since the fracture had not healed over a long period of time. Unfortunately, the surgery left Dr. Goodman with a sharp stump which 'digs' into his posterior perineal area whenever he sits down and this causes severe discomfort."

- "Then, in 2005, Dr. Goodman began experiencing progression of the perineal pain. He consulted a rectal surgeon, Dr. Daniel Ng, who diagnosed a rectal fistula. After a number of failed office procedures by Dr. Ng, the surgeon recommended surgery to clean out the fistula. Again, unfortunately, Dr. Goodman had a bad outcome from the surgery. At surgery, Dr. Ng accidentally cut Dr. Goodman's internal rectal sphincter which resulted in Dr. Goodman experiencing fecal incontinence. In addition, Dr. Ng also accidentally damaged the rectal branch of the pudendal nerve in Dr. Goodman's rectum. This has led to increasingly severe pain in the perineal nerve in Dr. Goodman's rectum."

- "It was during this period that Dr. Goodman began experiencing pain in his feet and a feeling that he was walking on rocks. He was referred by Dr. Boyd to Dr. Peng, an orthopedic foot surgeon…"

- "It was Dr. Peng who then suggested that the symptoms could be more likely secondary to a peripheral neuropathy. Dr. Peng then ordered the nerve conduction test. This test was performed by Dr. Boyd and confirmed peripheral neuropathy."

- "Due to the pain and the emotional trauma of leaving his medical practice which he has spent 30 years building, Dr. Goodman had been experiencing some significant depression."

- "Dr. Boyd has been titrating Dr. Goodman's medications, and despite now fairly high doses of Lyrica Dr. Goodman is still in constant pain and needs round the clock pain medications along with sedating muscle relaxers and antidepressants. In addition, he reports that the pain medication does not control the perineal pain and he needs to wear a TENS unit with electrodes on the tailbone stump to give any relief at all."

- "In conclusion, you will see from the above that the review and evaluation by Dr. Anderson was quite incomplete and in many areas inaccurate. It is my opinion that with the level of pain that Dr. Goodman experiences, both sitting from the perineal issues, and on standing because of the neuropathy, his need to deal with the fecal incontinence, and the cognitive difficulties secondary to the medications he is taking, that he should be considered completely disabled and unable to perform any of his tasks as an Internist."

27.    Despite Dr. Daoud's opinion and all of the medical evidence supporting DR. GOODMAN's claim, LINCOLN NATIONAL denied DR. GOODMAN's claim for benefits on June 1, 2011.

28.    To date, Defendant has failed to any benefits under the Policy despite all of the medical evidence supportive of DR. GOODMAN's disability.

**PLAINTIFF, GILBERT GOODMAN, M.D., FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANTS, THE LINCOLN NATIONAL LIFE INSURANCE COMPANY; and DOES 1 through 10 inclusive, FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING, ALLEGES:**

1.    Plaintiff refers to each and every paragraph of the General Allegations and incorporates those paragraphs as though set forth in full in this cause of action.

2.    Defendants, and each of them, have breached their duty of good faith and fair dealing owed to Plaintiff in the following respects:

a.    Unreasonably failing to make payments to Plaintiff at a time when Defendants knew that Plaintiff was entitled to the payments under the terms of the Policy.

b.    Unreasonably delaying payments to Plaintiff knowing Plaintiff's claim for benefits under the Policy to be valid.

c.    Unreasonably withholding payments from Plaintiff knowing Plaintiff's claim for benefits under the Policy to be valid.

d.    Unreasonably misrepresenting to Plaintiff pertinent facts and insurance Policy provisions relating to the coverage in issue.

e.    Failing to reasonably and promptly investigate and process Plaintiff's claim for benefits.

f.    Not attempting in good faith to effectuate a prompt, fair and equitable settlement of Plaintiff's claim for benefits in which liability has become reasonably clear.

g.    Failing to promptly provide a reasonable explanation of the basis relied upon in the

Case No: _____                    – 7 –

DONAHUE & HORROW, LLP

Policy, in relation to the applicable facts, for the denial of Plaintiff's claim for benefits.

h.      Plaintiff is informed and believes and thereon alleges that Defendant has breached its duty of good faith and fair dealing owed to Plaintiff by other acts or omissions of which Plaintiff is presently unaware and which will be shown according to proof at the time of trial.

3.      As a proximate result of the aforementioned unreasonable conduct of Defendants, Plaintiff has suffered, and will continue to suffer in the future, damages under the Policy, plus interest, and other economic and consequential damages, for a total amount to be shown at the time of trial.

4.      As a further proximate result of the aforementioned unreasonable conduct of Defendants, Plaintiff has suffered anxiety, worry, mental and emotional distress, all to Plaintiff's general damage in a sum to be determined at the time of trial.

5.      As a further proximate result of the unreasonable conduct of Defendants, Plaintiff was compelled to retain legal counsel to obtain the benefits due under the Policy. Therefore, Defendants are liable to Plaintiff for those attorneys' fees, witness fees and costs of litigation reasonably necessary and incurred by Plaintiff in order to obtain the Policy benefits in a sum to be determined at the time of trial.

6.      Defendants' conduct described herein was intended by Defendants to cause injury to Plaintiff or was despicable conduct carried on by the Defendants with a willful and conscious disregard of the rights of Plaintiff, or subjected Plaintiff to cruel and unjust hardship in conscious of Plaintiff's rights, or was an intentional misrepresentation, deceit, or concealment of a material fact known to the Defendants with the intention to deprive Plaintiff of property, legal rights or to otherwise cause injury, such as to constitute malice, oppression or fraud under California Civil Code § 3294, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish or set an example of Defendants.

7.      Defendants' conduct was highly reprehensible because (1) it caused Plaintiff not only substantial economic loss, but also personal physical injury and physical sickness; (2) it demonstrated Defendants' indifference and reckless disregard as to the health and safety of Plaintiff; (3) it was repeated and continuous, rather than just an isolated incident; (4) it caused harm to Plaintiff not by accident, but rather by Defendants' intentional malice, trickery, and deceit; and (5) plaintiff was financially vulnerable to Defendants' conduct.

DONAHUE & HORROW, LLP

8.   Defendants' conduct described herein was undertaken by the corporate Defendant's deputies or managing agents, identified herein as DOES 1 through 10, who were responsible for claims supervision and operations, underwriting, communications and/or decisions. The aforedescribed conduct of said managing agents and individuals was therefore undertaken on behalf of the corporate Defendants. Said corporate Defendants further had advance knowledge of the actions and conduct of said individuals whose actions and conduct were ratified, authorized, and approved by managing agents whose precise identities are unknown to Plaintiff at this time and are therefore identified and designated herein as DOES 1 through 10, inclusive.

### PLAINTIFF, GILBERT GOODMAN, M.D., FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANTS, THE LINCOLN NATIONAL LIFE INSURANCE COMPANY; and DOES 1 through 10 inclusive, FOR BREACH OF CONTRACT, ALLEGES:

9.   Plaintiff refers to each and every paragraph of the General Allegations and incorporates those paragraphs as though set forth in full in this cause of action.

10.   Defendants, and each of them, owed duties and obligations to Plaintiff under the Policy.

11.   Defendants, and each of them, breached the terms and provisions of the insurance Policy by failing and refusing to pay benefits under the Policy as set forth in the second paragraph of the First Cause of Action, incorporated herein by reference.

12.   As a direct and proximate result of Defendants' conduct and breach of their contractual obligations, Plaintiff has suffered damages under the Policy in an amount to be determined according to proof at the time of trial.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

### AS TO THE FIRST CAUSE OF ACTION AGAINST DEFENDANTS, THE LINCOLN NATIONAL LIFE INSURANCE COMPANY ; AND DOES 1 through 10, inclusive, FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING:

1.   Damages for failure to provide benefits under the Policy, plus interest, including prejudgment interest pursuant to Section 10111.2 of the California Insurance Code, and other economic and consequential damages, in a sum to be determined at the time of trial;

2.   General damages for mental and emotional distress in a sum to be determined at the time of trial; For attorneys' fees, witness fees and costs of litigation incurred by Plaintiff to obtain the Policy's benefits in an amount to be determined at the time of trial;

3.   Punitive and exemplary damages in an amount appropriate to punish or set an example of

Case No:                                        – 9 –

DONAHUE & HORROW, LLP

Defendants;

    4.    For costs of suit incurred herein; and,

    5.    For such other and further relief as the Court deems just and proper.

**AS TO THE SECOND CAUSE OF ACTION AGAINST DEFENDANTS, THE LINCOLN NATIONAL LIFE INSURANCE COMPANY; AND DOES 1 through 10, inclusive, FOR BREACH OF CONTRACT:**

    1.    Damages under the Policy in an amount to be determined according to proof at the time of trial;

    2.    For costs of suit incurred herein; and,

    3.    For such other and further relief as the Court deems just and proper.


Dated:  September 28, 2011           DONAHUE & HORROW LLP

                                            MICHAEL B. HORROW
                                          Attorney for Plaintiff

<strong><u>DEMAND FOR JURY TRIAL</u></strong>

Plaintiff hereby demands a trial by jury.

Dated:  September 28, 2011           DONAHUE & HORROW LLP

                                            MICHAEL B. HORROW
                                          Attorney for Plaintiff

DONAHUE & HORROW, LLP

SUMMONS **COPY**

SUM-100

**SUMMONS**
*(CITACION JUDICIAL)*



*FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)*

**FILED**
SUPERIOR COURT OF CALIFORNIA
CENTRAL JUSTICE CENTER

**SEP 29 2011**

ALAN CARLSON, Clerk of the Court

BY    **F. IBARRA**    DEPUTY

**NOTICE TO DEFENDANT:** THE LINCOLN NATIONAL LIFE INSURANCE
*(AVISO AL DEMANDADO):* COMPANY; and; DOES 1 through 10, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:** GILBERT GOODMAN, M.D.,
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: <br> *(El nombre y dirección de la corte es):* <br> Superior Court of California, County of Orange <br> 700 Civic Center Drive West <br> Santa Ana, California 92701 | CASE NUMBER: <br> *(Número del Caso):* <br> **30-2011** <br> **00511956** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
DONAHUE & HORROW LLP
DONAHUE & HORROW LLP, 1960 East Grand Avenue, Suite 1215, El Segundo, CA 90245    (310) 322-0300

**JUDGE SHEILA FELL**

**DEPT. C22**

DATE: **SEP 29 2011**    **ALAN CARLSON**, Clerk, by    **FIDEL IBARRA**    , Deputy
*(Fecha)*                    *(Secretario)*                              *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**BY FAX**

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):*    The Lincoln National Life Insurance Company

    under: ☒ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
           ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov
**ProDoc®**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | | FOR COURT USE ONLY |
|---|---|---|

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*
Michael B. Horrow        SBN: 162917
DONAHUE & HORROW LLP        e-mail:
1960 East Grand Avenue, Suite 1215, El Segundo, CA 90245
TELEPHONE NO.: (310) 322-0300        FAX NO.: (310) 322-0302
ATTORNEY FOR *(Name):* Gilbert Goodman

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** ORANGE
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS: 700 Civic Center Drive West
CITY AND ZIP CODE: Santa Ana, 92701
BRANCH NAME: Central Justice Center

CASE NAME: Goodman v. The Lincoln National Life Insurance Company, et al.

COPY

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

SEP 29 2011

ALAN CARLSON, Clerk of the Court

BY E. IBARRA     DEPUTY

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: 30-2011 |
|---|---|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter | [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | 00511956 JUDGE: DEPT.: JUDGE SHEILA FELL DEPT. C22 |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [X] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [ ] is [X] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties          d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel      e. [ ] Coordination with related actions pending in one or more courts
         issues that will be time-consuming to resolve                  in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence              f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a.[X] monetary   b.[ ] nonmonetary; declaratory or injunctive relief   c.[X] punitive
4. Number of causes of action *(specify):* (2) Breach of the Duty of Good Faith and Fair Dealing; Breach of Contract.
5. This case [ ] is [X] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: September 28, 2011

Michael B. Horrow
(TYPE OR PRINT NAME)                                      (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

BY FAX

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**  ProDoc®

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

CM-010

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) (*if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto*)

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability (*not asbestos or toxic/environmental*) (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) (*not civil harassment*) (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    (*not medical or legal*)
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract (*not unlawful detainer or wrongful eviction*)
  Contract/Warranty Breach–Seller
    Plaintiff (*not fraud or negligence*)
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage (*not provisionally complex*) (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property (*not eminent domain, landlord/tenant, or foreclosure*)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential*)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  (*arising from provisionally complex case type listed above*) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment (*non-domestic relations*)
  Sister State Judgment
  Administrative Agency Award
    (*not unpaid taxes*)
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified above*) (42)
  Declaratory Relief Only
  Injunctive Relief Only (*non-harassment*)
  Mechanics Lien
  Other Commercial Complaint
    Case (*non-tort/non-complex*)
  Other Civil Complaint
    (*non-tort/non-complex*)

**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition (*not specified above*) (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition

CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Page 2 of 2

# SUPERIOR COURT OF CALIFORNIA
## ORANGE COUNTY – CENTRAL JUSTICE CENTER
## CIVIL DEPARTMENT CALENDAR SCHEDULING CHART
### Ex Parte applications must comply with California Rules of Court, rules 3.1200 – 3.1207
### Court Local Rules are located at www.occourts.org

| Dept. | Judicial Officer | Motion Days and Time | Ex Parte Days and Time | Telephonic Notice to Courtroom the day before the hearing but no later than: | Ex Parte Application and Proposed Order presented to the court the day before the hearing but no later than: | Rulings posted on Internet? | Other<br>Call for available dates. |
|---|---|---|---|---|---|---|---|
| C11 | BANKS<br>657-622-5211 | Friday<br>1:30 p.m. | Daily<br>8:45 a.m. | Noon day before Ex Parte hearing-Reservation must be made with courtroom prior to hearing being set | 3:00 p.m. | Yes | Call (657) 622-5211 to reserve motion date. Moving party must submit on moving papers unless court invites oral argument. Counsel must reserve Ex Parte hearings with the courtroom by calling (657) 622-5211 and supply whatever information may be requested |
| C20 | CHAFFEE<br>657-622-5220 | Friday<br>9:30 a.m. | Daily<br>1:30 p.m. | None | Noon | Yes<br>3:00 p.m.<br>the day before | Teleconference appearances are voluntary and do not require consent by court or other parties. However, the court reserves the right to reject any request. Teleconference appearances are conducted in conformity with the guidelines, which are available by calling CourtCall, LLC at (310) 914-7884 or (888) 88-COURT |
| C25 | COLAW<br>657-622-5225 | Friday<br>10:00 a.m. | Daily<br>1:30 p.m. | noon day before Ex Parte hearing-Reservation must be made with courtroom prior to hearing being set | 4:00 p.m. day before the Ex Parte hearing | Yes. 3:00 p.m. day before | Teleconference appearances will be allowed for Case Management Conferences, OSC re Dismissal, Review hearings and Law and Motion hearings. They do not require consent by court or other parties. However, the court reserves to right to reject any request. Teleconference appearances are conducted in conformity with the guidelines, which are available by calling CourtCall, LLC at (310)914-7884 or (888) 88-COURT. |
| C15 | FIRMAT<br>657-622-5215 | Wednesday<br>3:00 p.m. | Daily<br>1:30 p.m. | Not required | 11:00 a.m. | Yes | Teleconference appearances are voluntary and do not require consent by court or other parties. However, the court reserves to right to reject any request. Teleconference appearances are conducted in conformity with the guidelines, which are available by calling CourtCall, LLC at (310)914-7884 or (888) 88-COURT. |
| C18 | DI CESARE<br>657-622-5218 | Thursday<br>1:30 p.m. | M,T,W,F<br>1:30 p.m. | Noon | 4:30 P.M. if day prior to the Ex Parte hearing is Monday-Thursday | Yes<br>3:00 p.m.<br>the day before | If there is no appearance for argument, the court will order the tentative ruling to become effective and final the date of the hearing. |
| C22 | FELL<br>657-622-5222 | Wednesday<br>10:00 a.m.<br>Motions must be reserved prior to filing by calling 657-622-5222. | Daily<br>8:30 a.m. | Not required | 2:00 p.m. | Yes<br>4:30 p.m.<br>the day before | Moving party must submit on moving papers unless the court invites oral argument. Oral argument will be heard on the hearing date. Oppositions must be in writing but may be hand written if presented at the time of appearance. |

7/1/2011

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF ORANGE

# ALTERNATIVE DISPUTE RESOLUTION (ADR)
# INFORMATION PACKAGE

### NOTICE TO PLAINTIFF(S) AND/OR CROSS-COMPLAINANT(S):

**Rule 3.221(c) of the California Rules of Court requires you to serve a copy of the ADR Information Package along with the complaint and/or cross-complaint.**

California Rules of Court – Rule 3.221
Information about Alternative Dispute Resolution (ADR)

(a) Each court shall make available to the plaintiff, at the time of filing of the complaint, an ADR Information Package that includes, at a minimum, all of the following:

(1) General information about the potential advantages and disadvantages of ADR and descriptions of the principal ADR processes.

(2) Information about the ADR programs available in that court, including citations to any applicable local court rules and directions for contacting any court staff responsible for providing parties with assistance regarding ADR.

(3) Information about the availability of local dispute resolution programs funded under the Dispute Resolutions Program Act (DRPA), in counties that are participating in the DRPA. This information may take the form of a list of the applicable programs or directions for contacting the county's DRPA coordinator.

(4) An ADR stipulation form that parties may use to stipulate to the use of an ADR process.

(b) A court may make the ADR Information Package available on its Web site as long as paper copies are also made available in the clerk's office.

(c) The plaintiff must serve a copy of the ADR Information Package on each defendant along with the complaint. Cross-complainants must serve a copy of the ADR Information Package on any new parties to the action along with the cross-complaint.

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF ORANGE

## ADR Information

**Introduction.**

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts and others offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. ADR is usually less formal, less expensive, and less time-consuming than a trial. ADR can also give people more opportunity to determine when and how their dispute will be resolved.

**BENEFITS OF ADR.**

Using ADR may have a variety of benefits, depending on the type of ADR process used and the circumstances of the particular case. Some potential benefits of ADR are summarized below.

**Save Time.**  A dispute often can be settled or decided much sooner with ADR; often in a matter of months, even weeks, while bringing a lawsuit to trial can take a year or more.

**Save Money.**  When cases are resolved earlier through ADR, the parties may save some of the money they would have spent on attorney fees, court costs, experts' fees, and other litigation expenses.

**Increase Control Over the Process and the Outcome.**  In ADR, parties typically play a greater role in shaping both the process and its outcome. In most ADR processes, parties have more opportunity to tell their side of the story than they do at trial. Some ADR processes, such as mediation, allow the parties to fashion creative resolutions that are not available in a trial. Other ADR processes, such as arbitration, allow the parties to choose an expert in a particular field to decide the dispute.

**Preserve Relationships.**  ADR can be a less adversarial and hostile way to resolve a dispute. For example, an experienced mediator can help the parties effectively communicate their needs and point of view to the other side. This can be an important advantage where the parties have a relationship to preserve.

**Increase Satisfaction.**  In a trial, there is typically a winner and a loser. The loser is not likely to be happy, and even the winner may not be completely satisfied with the outcome. ADR can help the parties find win-win solutions and achieve their real goals. This, along with all of ADR's other potential advantages, may increase the parties' overall satisfaction with both the dispute resolution process and the outcome.

**Improve Attorney-Client Relationships.**  Attorneys may also benefit from ADR by being seen as problem-solvers rather than combatants. Quick, cost-effective, and satisfying resolutions are likely to produce happier clients and thus generate repeat business from clients and referrals of their friends and associates.

**DISADVANTAGES OF ADR.**

ADR may not be suitable for every dispute.

**Loss of protections.**  If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

**Less discovery.** There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

**Additional costs.** The neutral may charge a fee for his or her services. If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

**Effect of delays if the dispute is not resolved.** Lawsuits must be brought within specified periods of time, known as statues of limitation. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

## TYPES OF ADR IN CIVIL CASES.

The most commonly used ADR processes are arbitration, mediation, neutral evaluation and settlement conferences.

**Arbitration.** In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed. Arbitration may be either "binding" or "nonbinding." *Binding arbitration* means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. Generally, there is no right to appeal an arbitrator's decision. *Nonbinding* arbitration means that the parties are free to request a trial if they do not accept the arbitrator's decision.

**Cases for Which Arbitration May Be Appropriate.** Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.

**Cases for Which Arbitration May <u>Not</u> Be Appropriate.** If parties want to retain control over how their dispute is resolved, arbitration, particularly binding arbitration, is not appropriate. In binding arbitration, the parties generally cannot appeal the arbitrator's award, even if it is not supported by the evidence or the law. Even in nonbinding arbitration, if a party requests a trial and does not receive a more favorable result at trial than in arbitration, there may be penalties.

**Mediation.** In mediation, an impartial person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties.

**Cases for Which Mediation May Be Appropriate.** Mediation may be particularly useful when parties have a relationship they want to preserve. So when family members, neighbors, or business partners have a dispute, mediation may be the ADR process to use. Mediation is also effective when emotions are getting in the way of resolution. An effective mediator can hear the parties out and help them communicate with each other in an effective and nondestructive manner.

**Cases for Which Mediation May <u>Not</u> Be Appropriate.** Mediation may not be effective if one of the parties is unwilling to cooperate or compromise. Mediation also may not be effective if one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

**Neutral Evaluation.** In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is

often an expert in the subject matter of the dispute. Although the evaluator's opinion is not binding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

**Cases for Which Neutral Evaluation May Be Appropriate.** Neutral evaluation may be most appropriate in cases in which there are technical issues that require special expertise to resolve or the only significant issue in the case is the amount of damages.

**Cases for Which Neutral Evaluation May Not Be Appropriate.** Neutral evaluation may not be appropriate when there are significant personal or emotional barriers to resolving the dispute.

**Settlement Conferences.** Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or a neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

## ADDITIONAL INFORMATION.

In addition to mediation, arbitration, neutral evaluation, and settlement conferences, there are other types of ADR, including conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR types. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute.

To locate a dispute resolution program or neutral in your community:
- Contact the California Department of Consumer Affairs, Consumer Information Center, toll free, 1-800-852-5210
- Contact the Orange County Bar Association at (949) 440-6700
- Look in the Yellow Pages under "Arbitrators" or "Mediators"

Free mediation services are provided under the Orange County Dispute Resolution Program Act (DRPA) For information regarding DRPA, contact:
- Community Service Programs, Inc. (949) 851-3168
- Orange County Human Relations (714) 834-7198

For information on the Superior Court of California, County of Orange court ordered arbitration program, refer to Local Rule 360.

The Orange County Superior Court offers programs for Civil Mediation and Early Neutral Evaluation (ENE). For the Civil Mediation program, mediators on the Court's panel have agreed to accept a fee of $300 for up to the first two hours of a mediation session. For the ENE program, members of the Court's panel have agreed to accept a fee of $300 for up to three hours of an ENE session. Additional information on the Orange County Superior Court Civil Mediation and Early Neutral Evaluation (ENE) pilot programs is available on the Court's website at www.occourts.org.

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name & Address):* | *FOR COURT USE ONLY* |
|---|---|
| Telephone No.:        Fax No. (Optional): <br> E-Mail Address (Optional): <br> ATTORNEY FOR *(Name):*       Bar No: | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
**JUSTICE CENTER:**
☐ Central - 700 Civic Center Dr. West, Santa Ana, CA 92701-4045
☐ Civil Complex Center - 751 W. Santa Ana Blvd., Santa Ana, CA 92701-4512
☐ Harbor-Laguna Hills Facility – 23141 Moulton Pkwy., Laguna Hills, CA 92653-1251
☐ Harbor – Newport Beach Facility – 4601 Jamboree Rd., Newport Beach, CA 92660-2595
☐ North – 1275 N. Berkeley Ave., P.O. Box 5000, Fullerton, CA 92838-0500
☐ West – 8141 13ᵗʰ Street, Westminster, CA 92683-0500

| PLAINTIFF/PETITIONER: | |
|---|---|
| DEFENDANT/RESPONDENT: | |
| **ALTERNATIVE DISPUTE RESOLUTION (ADR) STIPULATION** | CASE NUMBER: |

Plaintiff(s)/Petitioner(s)_____

and defendant(s)/respondent(s), _____

agree to the following dispute resolution process:

☐ Mediation

☐ Arbitration (must specify code)
    ☐ Under section 1141.11 of the Code of Civil Procedure
    ☐ Under section 1280 of the Code of Civil Procedure

☐ Neutral Case Evaluation

The ADR process must be completed no later than 90 days after the date of this Stipulation or the date the case was referred, whichever is sooner.

☐ I have an *Order on Court Fee Waiver* (FW-003) on file, and the selected ADR Neutral(s) are eligible to provide pro bono services.

☐ The ADR Neutral Selection and Party List is attached to this Stipulation.

We understand that there may be a charge for services provided by neutrals. We understand that participating in an ADR process does not extend the time periods specified in California Rules of Court rule 3.720 et seq.

Date: _____    _____    _____
                             (SIGNATURE OF PLAINTIFF OR ATTORNEY)     (SIGNATURE OF PLAINTIFF OR ATTORNEY)

Date: _____    _____    _____
                             (SIGNATURE OF DEFENDANT OR ATTORNEY)   (SIGNATURE OF DEFENDANT OR ATTORNEY)

---

**ALTERNATIVE DISPUTE RESOLUTION (ADR) STIPULATION**

Approved for Optional Use                                       California Rules of Court, rule 3.221
L1270 (Rev. January 2010)

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE<br>JUSTICE CENTER:<br>☒ Central - 700 Civic Center Dr. West, Santa Ana, CA 92701-4045<br>☐ Civil Complex Center - 751 W. Santa Ana Blvd., Santa Ana, CA 92701-4512<br>☐ Harbor-Laguna Hills Facility – 23141 Moulton Pkwy., Laguna Hills, CA 92653-1251<br>☐ Harbor – Newport Beach Facility – 4601 Jamboree Rd., Newport Beach, CA 92660-2595<br>☐ North – 1275 N. Berkeley Ave., P.O. Box 5000, Fullerton, CA 92838-0500<br>☐ West – 8141 13th Street, Westminster, CA 92683-0500 | FOR COURT USE ONLY |
|---|---|
| PLAINTIFF/PETITIONER:<br><br>DEFENDANT/RESPONDENT: | |
| **ALTERNATIVE DISPUTE RESOLUTION (ADR)<br>NEUTRAL SELECTION AND PARTY LIST**<br>☐Arbitration ☐Mediation ☐Neutral Evaluation | CASE NUMBER: |

**(ATTACH THIS FORM TO FORM L-1270, ALTERNATIVE DISPUTE RESOLUTION (ADR)
STIPULATION, AND FILE IT WITH THE COURT.)**

**ADR NEUTRAL SELECTION**

For Arbitration, parties may select a Neutral and Alternate or may have a Neutral randomly assigned from the Court's Panel.  For Mediation and Neutral Evaluation, parties must select a Neutral and an Alternate below.

☐ For Arbitration, please check this box to have an arbitrator assigned at random.

The parties select the following Neutral and Alternate from the Court ADR Panel:

Neutral: _____

Alternate:_____

The above named Neutral will be notified by a Notice of Assignment of ADR Neutral that he or she has been selected as the neutral in this proceeding.  In the event the neutral does not accept the assignment, a new Notice of Assignment of ADR Neutral will be sent to the above named Alternate.  The assignment of the Alternate to serve as the Neutral does not extend the time to complete the ADR process.

**ALTERNATIVE DISPUTE RESOLUTION (ADR)
NEUTRAL SELECTION AND PARTY LIST**

Adopted for Mandatory Use
L2748 (New February 2008)

www.occourts.org

| Short Title: | Case Number: |
|---|---|

**PARTY LIST**
**(Including Affiliates)**

The parties agree that the ADR Session may be conducted on one of the following dates:

1._____ 2._____ 3._____ 4._____

Attorney and Firm Name:_____

Mailing Address:_____City_____ZIP_____

Area Code and Telephone Number:_____Fax_____

Attorney for:_____

Attorney and Firm Name:_____

Mailing Address:_____City_____ZIP_____

Area Code and Telephone Number:_____Fax_____

Attorney for:_____

Attorney and Firm Name:_____

Mailing Address:_____City_____ZIP_____

Area Code and Telephone Number:_____Fax_____

Attorney for:_____

Attorney and Firm Name:_____

Mailing Address:_____City_____ZIP_____

Area Code and Telephone Number:_____Fax_____

Attorney for:_____

This Party List must also include the full names, addresses, and phone numbers of corporate parties' parent and subsidiary corporations, and of all insurance carriers.  Counsel must immediately notify the neutral upon discovery if any attorney or self-represented party is not listed on this Party List Form.

☐ Attach additional copies of this page if necessary to include additional parties, affiliated entities or insurance carriers.

**ALTERNATIVE DISPUTE RESOLUTION (ADR)**
**NEUTRAL SELECTION AND PARTY LIST**

Adopted for Mandatory Use
L2748 (New February 2008)                                    www.occourts.org

# EXHIBIT B

**The Lincoln National Life Insurance Company**
Group Insurance Service Office
8801 Indian Hills Drive
Omaha, Nebraska 68114-4066

`Office Use Only ID#` [                    ]

## APPLICATION FOR GROUP INSURANCE
*is hereby made to THE LINCOLN NATIONAL LIFE INSURANCE COMPANY (the Company).*

### A.  NAME AND ADDRESS

1. Applicant's Full Legal Name (exactly as to be shown in Group Policy): Cooperative of American Physicians, Inc. (CAP)

2. Main Office Address (physical location and group situs state):

   Street 333 S. Hope Street, 8th Floor        City Los Angeles        State CA

   Zip 90071      Phone # (213) 493-8747  FAX # (213) 576-8563      E-Mail Address rwolf@cap-mpt
   (if available)

### B.  REQUESTED COVERAGES

The following Group Insurance is applied for as specified in the sold case proposal(s).  Complete the requested Effective Date for each coverage.

[X] Life & AD&D with Effective Date 3/1/10            [X] Voluntary Life with Effective Date 3/1/10
[X] Long Term Disability with Effective Date 4/1/10   [ ] Voluntary Life & AD&D with Effective Date
[ ] Short Term Disability with Effective Date         [X] Voluntary Long Term Disability with Effective Date 4/1/10
[ ] Dental with Effective Date                        [ ] Voluntary Dental with Effective Date

### C.  BUSINESS INFORMATION

1. Nature of Business (Please specify): Administrator for medical professional liability provider;

   Years in Business 32            Federal Tax ID# 95-2988063            agency for other
                                                                         insurance products.

2. Business is Organized As (select one):
   [X] Corporation      [ ] Non-Profit Organization
   [ ] Partnership      [ ] Proprietorship      [ ] Other

3. Financial Risk (If Yes to any part, please explain below.)
   [ ] Yes  [X] No  Has Applicant ever filed for bankruptcy?
   [ ] Yes  [X] No  Does Applicant anticipate ceasing or materially reducing active business operations?
   [ ] Yes  [X] No  Has Applicant opted out (or do they anticipate opting out) of Workers' Compensation?

   Explanation:

4. Binder payment submitted:  Amount $                      (if applicable)

### D.  REPLACEMENT COVERAGE

[X] Yes  [ ] No   Will all or part of this coverage replace any similar coverage?  If Yes, provide details of the prior plan below and enclose a copy of each inforce contract to be replaced.

| Coverage Type | Prior Carrier Name | Prior Plan Effective Date | Termination Date |
|---|---|---|---|
| Group Disability | Standard Insurance Company | 1/1/06 | 4/1/10 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

GL2-APP.09/02 CA

*E.   FRAUD WARNING*

**NOTICE:** California law prohibits an HIV test from being required or used by health insurance companies as a condition of obtaining health insurance coverage.

**NOTICE:** A person may be committing insurance fraud if he or she submits an application containing a false or deceptive statement with the intent to defraud (or knowing that he or she is helping to defraud) an insurance company.

*F.   AGREEMENT.* The Applicant hereby applies for group insurance. The information in this Application is true and correct to the best of the Applicant's knowledge and belief. It forms the basis for this request for group insurance. Omission or misstatement of known information on this Application could effect the validity of any insurance issued and cause the denial of an otherwise valid claim. The Applicant understands that the requested group insurance will:

    (a)   be issued only if the requested insurance is acceptable to the Company and is legally permissible;
    (b)   be issued under a group Policy or Policies in the language customarily used by the Company;
    (c)   be subject to the Company's usual underwriting requirements (including Evidence of Insurability, if applicable);
    (d)   be subject to all exclusions and limitations of the Policy; and
    (e)   take effect on the date determined by the Company.

The Applicant understands that no agent or broker has the authority to guarantee the acceptability of the requested insurance. The effective date of insurance for which an employee is required to submit satisfactory Evidence of Insurability will be determined in accord with the Policy's terms, and will be subject to the Active Work requirement. The Applicant agrees not to:

    (a)   collect or pay premiums (other than the Binder Premium, if any) for such insurance, before receiving the Company's notice of approval; or
    (b)   distribute material describing Policy coverage to persons to be insured, without the Company's prior written consent.

If dental insurance is requested, the Applicant agrees to provide employees and dependents notice of any applicable continuation rights, required by federal COBRA law or any similar state continuation law. Premium rate quotes were based on data submitted to the Company. Final premium rates will be determined by the actual composition of the group. This application and the Binder payment, if any, constitutes the consideration for any Policy issued. After receipt of the Policy, payment of the premium is deemed acceptance of the Policy's terms. If this Application is approved, it will be made a part of any Policy issued.

Writing Agent
Or Broker's Signature _____

Typed or Printed Name __J. BRIAN W. HORN__

License Number __0659290__    State __CA__

Signed by Applicant's Authorized Representative;

Signature _____

Typed or Printed Name __James L. Weidner__

Title __Chief Executive Officer__

State Signed __California__    Date __1/12/2010__

Must be signed prior to Effective Date

GL2-APP.09/02 CA

### PARTICIPATION AGREEMENT
### The Lincoln National Life Insurance Company (herein called the Company)
*Complete only if applying for coverage under The Lincoln National Life Insurance Company Voluntary Insurance Trust.*

Note: Do not complete in AL, MN or MS.

Application is hereby made to become a Participating Membership Association under The Lincoln National Life Insurance Company's Voluntary Insurance Trust, based on the following statements plus the attached application for group insurance coverage. The Group Membership Association named below (herein called the Membership Association) understands that if Voluntary Group Term Life and AD&D or Disability Income insurance is requested and approved, such Membership Association will become a Participating Membership Association under The Lincoln National Life Insurance Company Voluntary Insurance Trust, sitused in Kansas City, Missouri. The Membership Association agrees to the terms of the Trust Agreement, each group policy issued to the Trust under which the Membership Association's members become insured, and any amendments to them. The Membership Association understands that group certificates will be supplied and agrees to distribute them to each member enrolled in the program. After receipt of the group certificates, payment of premium is deemed acceptance of the policy's terms.

The Membership Association agrees to be responsible for all premiums payable with respect to any of my members who will be insured under the policy. The Membership Association agrees to honor and administer on a timely basis the written payroll deduction request of each participant, in the amount required to pay the necessary premium to keep coverage in-force. Payroll deductions will be remitted to the Company on a timely basis, in accord with the billing schedule agreed upon. The Membership Association agrees to promptly furnish the Company any information reasonably required to administer the coverage and claims under it.

The Membership Association understands that participation in the program may be terminated at any time by giving prior written notice to the Company. The effective date of termination will be the date the notice is received by the Company's Group Insurance Service Office, or on any later date stated in the notice. The Membership Association understands that the Company may terminate the Membership Association's participation based on the following circumstances:

a)   at the end of the grace period during which the required premium has not been paid;
b)   on any premium due date on which participation in the program falls below a minimum level of 10 members;
c)   on any premium due date when the Member has failed to perform any duties related to the program in good faith;
d)   on any premium due date after the premium rate has been in effect for at least 12 months (or any longer Rate Guarantee period agreed upon by the Company).

The Membership Association understands that the Company may change any premium rate:

a)   when there is a change in the terms of the policy, or in the factors bearing on the risk assumed;
b)   when the policy liability is changed as a result of a change in federal, state or local law;
c)   when a division, subsidiary or affiliate is added, removed, or relocated;
d)   when the number of insured members has changed by 25% or more since the Rate Guarantee period began;
e)   on any premium due date after the expiration of the Rate Guarantee period agreed upon by the Company.

### SIGNATURE
I have read and understand the agreement above and will comply with the agreement as stated. I have reviewed, understand and agree to the proposal, rate structure, and enrollment strategy presented to me by the Company representative. I understand that no agent, broker or field representative has any right to bind the requested coverage, alter the terms of the policies or enrollment materials, adjust any claim for benefits, or waive any of the Company's rights or requirements.

Group Employer Name & ID   Cooperative of American Physicians, Inc. (CAP)

James L. Weidner
Printed Name of Authorized Officer of Membership Association

Signature of Authorized Company Officer

Chief Executive Officer
Title

Date   1/13/2010

VPA2007

# The Lincoln National Life Insurance Company

A Stock Company      Home Office Location: Fort Wayne, Indiana
Group Insurance Service Office:  8801 Indian Hills Drive, Omaha, NE 68114-4066 (402) 361-7300

In Consideration of the application for this Policy made by

Cooperative of American Physicians, Inc.

(herein called the Policyholder)

and the payment of all premiums when due, The Lincoln National Life Insurance Company agrees to make the payments provided in this Policy to the person or persons entitled to them.

Policy No.      000010125650      Policy Effective Date:      April 1, 2010

Monthly Premium:      See Premium Rate Schedule  % of Total Covered Payroll per Month.

The above rates are guaranteed until April 1, 2012, unless any of the Policy's terms are changed.

Policy Anniversaries will be annually beginning on:  April 1, 2012

The first premium is due on this Policy's Effective Date, and subsequent premiums are due on May 1, 2010, and on the same day of each month thereafter.

This Policy is delivered in the state of California and subject to the laws of that jurisdiction.

The Lincoln National Life Insurance Company has executed this Policy at its Group Insurance Service Office in Omaha, Nebraska this 4th day of March, 2010.

**IMPORTANT INFORMATION REGARDING YOUR INSURANCE.  If you need to contact someone about this insurance for any reason, please contact your agent.  If no agent was involved in its sale, or if you have additional questions; then you may contact the insurance company at the above address or phone them at 1-800-423-2765.  If unable to obtain satisfaction from the company or agent, you may contact the state regulatory agency at California Department of Insurance, Consumer Communications Bureau, 300 South Spring Street, Los Angeles, CA  90013, or phone them at 1-800-927-4357.  Please have your policy number available.**

SECRETARY                                        PRESIDENT

## GROUP LONG TERM DISABILITY INSURANCE POLICY

GL3001-LTD-1

Policy Face Page CA
04/01/10

## PREMIUM RATE SCHEDULE

Monthly Premium:  $3.67 per Insured Employee for the Core Benefit

Monthly Premium for Class 1:

### Monthly Long Term Disability Rate for Buy-Up Benefits

| Insured Employee's Attained Age | Monthly Rate per $100 of Covered Payroll |
|---|---|
| Less than 30 | $.78 |
| 30 - 34 | 1.28 |
| 35 - 39 | 2.16 |
| 40 - 44 | 3.16 |
| 45 - 49 | 4.62 |
| 50 - 54 | 7.04 |
| 55 - 59 | 9.55 |
| 60 - 64 | 11.00 |
| 65 - 69 | 12.31 |
| 70 - 74 | 13.46 |
| 75 and over | 13.46 |

Rate changes due to an increase in age will become effective on the Policy Anniversary date coinciding with or next following the Insured Person's birthday.

Monthly Premium for Class 2:

### Monthly Long Term Disability Rate for Buy-Up Benefits

| Insured Employee's Attained Age | Monthly Rate per $100 of Covered Payroll |
|---|---|
| Less than 30 | $.36 |
| 30 - 34 | .59 |
| 35 - 39 | .99 |
| 40 - 44 | 1.45 |
| 45 - 49 | 2.12 |
| 50 - 54 | 3.23 |
| 55 - 59 | 4.38 |
| 60 - 64 | 5.41 |
| 65 - 69 | 5.59 |
| 70 - 74 | 6.14 |
| 75 and over | 6.14 |

Rate changes due to an increase in age will become effective on the Policy Anniversary date coinciding with or next following the Insured Person's birthday.

GL3001-LTD-1

Policy Face Page CA
04/01/10

Monthly Premium for Class 3:

### Monthly Long Term Disability Rate for Buy-Up Benefits

| Insured Employee's Attained Age | Monthly Rate per $100 of Covered Payroll |
|---|---|
| Less than 30 | $.17 |
| 30 - 34 | .27 |
| 35 - 39 | .46 |
| 40 - 44 | .67 |
| 45 - 49 | .98 |
| 50 - 54 | 1.49 |
| 55 - 59 | 2.02 |
| 60 - 64 | 2.67 |
| 65 - 69 | 2.92 |
| 70 - 74 | 3.18 |
| 75 and over | 3.18 |

Rate changes due to an increase in age will become effective on the Policy Anniversary date coinciding with or next following the Insured Person's birthday.

GL3001-LTD-1

Policy Face Page CA
04/01/10

# TABLE OF CONTENTS

Schedule of Benefits ..................................................................... 3

Definitions.................................................................................. 4

General Provisions.................................................................... 10

Claims Procedures .................................................................... 12

Eligibility.................................................................................. 15

Effective Dates ......................................................................... 15

Individual Termination............................................................. 17

Policy Termination ................................................................... 18

Premiums and Premium Rates................................................. 19

Total Disability Monthly Benefit............................................. 20

Progressive Income Benefit ..................................................... 21

Partial Disability Monthly Benefit .......................................... 23

Other Income Benefits ............................................................. 25

Recurrent Disability ................................................................. 27

Exclusions................................................................................. 28

Specified Injuries or Sicknesses Limitation ............................ 29

Voluntary Vocational Rehabilitation Benefit Provision .......... 31

Reasonable Accommodation Benefit........................................ 32

Prior Insurance Credit Upon Transfer of Insurance Carriers ... 33

Family Income Benefit.............................................................. 34

Notice ....................................................................................... 36

Cooperative of American Physicians, Inc.
000010125650

## SCHEDULE OF BENEFITS

ELIGIBLE CLASS means:  Class 1      All Members in Good Standing practicing Anesthesiology

MINIMUM HOURS PER WEEK:  See definition of Member

## LONG-TERM DISABILITY BENEFITS

BENEFIT PERCENTAGE:    60%

MAXIMUM MONTHLY BENEFIT:    $2,000 if Core Benefit only is elected; or $6,000 if Buy-Up Benefit is elected

MINIMUM MONTHLY BENEFIT:    $500

Long-Term Disability Benefits for PRE-EXISTING CONDITIONS will be subject to the Pre-Existing Condition Exclusion on the Exclusion page.

ELIMINATION PERIOD:  90 calendar days of Disability caused by the same or a related Sickness or Injury, which must be accumulated within a 180 calendar day period.

### CORE BENEFIT
**MAXIMUM BENEFIT PERIOD:** (For Sickness, Injury, or Pre-Existing Conditions):

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than Age 68 | 2 years |
| 68 - 69 | To Age 70 |
|  | (but not less than 1 year) |
| 70 and Over | 1 year |

### BUY-UP BENEFIT
**MAXIMUM BENEFIT PERIOD:** (For Sickness, Injury, or Pre-Existing Conditions):    The Insured Employee's Social Security Normal Retirement Age, or the Maximum Benefit Period shown below (whichever is later).

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than Age 60 | To Age 65 |
| 60 | 60 months |
| 61 | 48 months |
| 62 | 42 months |
| 63 | 36 months |
| 64 | 30 months |
| 65 | 24 months |
| 66 | 21 months |
| 67 | 18 months |
| 68 | 15 months |
| 69 and Over | 12 months |

GL3001-LTD-SB

04/01/10

## SCHEDULE OF BENEFITS (CONTINUED)

OWN OCCUPATION PERIOD means a period beginning at the end of the Elimination Period and ending at the end of the Maximum Benefit Period for Insured Employees.

WAITING PERIOD:   None  (For date insurance begins, refer to "Effective Dates" section)

CONTRIBUTIONS:   Insured employees are not required to contribute to the cost of the Long-Term Disability Core Benefit. Insured employees are required to contribute to the cost of the Long-Term Disability Buy-Up Benefit.

Under the Policy Termination Section on form GL3001-LTD-10, Items (2) and (3) do not apply to the Buy-Up Benefit.  Instead, the Company may terminate the Buy-Up Benefit under this Policy on the due date of any premium if less than 15% of those eligible for coverage are insured.

GL3001-LTD-SB

04/01/10

Cooperative of American Physicians, Inc.
000010125650

## SCHEDULE OF BENEFITS

ELIGIBLE CLASS means:  Class 2    All Members in Good Standing practicing Emergency Medicine, Gastroenterology, Hematology, Obstetrics/Gynecology, Radiology or Surgery

MINIMUM HOURS PER WEEK:  See definition of Member

## LONG-TERM DISABILITY BENEFITS

BENEFIT PERCENTAGE:    60%

MAXIMUM MONTHLY BENEFIT:    $2,000 if Core Benefit only is elected; or $6,000 if Buy-Up Benefit is elected

MINIMUM MONTHLY BENEFIT:    $500

Long-Term Disability Benefits for PRE-EXISTING CONDITIONS will be subject to the Pre-Existing Condition Exclusion on the Exclusion page.

ELIMINATION PERIOD:  90 calendar days of Disability caused by the same or a related Sickness or Injury, which must be accumulated within a 180 calendar day period.

### CORE BENEFIT
**MAXIMUM BENEFIT PERIOD:** (For Sickness, Injury, or Pre-Existing Conditions):

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than Age 68 | 2 years |
| 68 - 69 | To Age 70 |
|  | (but not less than 1 year) |
| 70 and Over | 1 year |

GL3001-LTD-SB

04/01/10

SCHEDULE OF BENEFITS (CONTINUED)

BUY-UP BENEFIT

**MAXIMUM BENEFIT PERIOD:** (For Sickness, Injury, or Pre-Existing Conditions):   The Insured Employee's Social Security Normal Retirement Age, or the Maximum Benefit Period shown below (whichever is later).

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than Age 60 | To Age 65 |
| 60 | 60 months |
| 61 | 48 months |
| 62 | 42 months |
| 63 | 36 months |
| 64 | 30 months |
| 65 | 24 months |
| 66 | 21 months |
| 67 | 18 months |
| 68 | 15 months |
| 69 and Over | 12 months |

OWN OCCUPATION PERIOD means a period beginning at the end of the Elimination Period and ending at the end of the Maximum Benefit Period for Insured Employees.

WAITING PERIOD:     None  (For date insurance begins, refer to "Effective Dates" section)

CONTRIBUTIONS:     Insured employees are not required to contribute to the cost of the Long-Term Disability Core Benefit. Insured employees are required to contribute to the cost of the Long-Term Disability Buy-Up Benefit.

Under the Policy Termination Section on form GL3001-LTD-10, Items (2) and (3) do not apply to the Buy-Up Benefit.   Instead, the Company may terminate the Buy-Up Benefit under this Policy on the due date of any premium if less than 15% of those eligible for coverage are insured.

GL3001-LTD-SB

04/01/10

Cooperative of American Physicians, Inc.
000010125650

## SCHEDULE OF BENEFITS

ELIGIBLE CLASS means:  Class 3      All Other Members in Good Standing

MINIMUM HOURS PER WEEK:  See definition of Member

### LONG-TERM DISABILITY BENEFITS

BENEFIT PERCENTAGE:    60%

MAXIMUM MONTHLY BENEFIT:    $2,000 if Core Benefit only is elected; or $6,000 if Buy-Up Benefit is elected

MINIMUM MONTHLY BENEFIT:    $500

Long-Term Disability Benefits for PRE-EXISTING CONDITIONS will be subject to the Pre-Existing Condition Exclusion on the Exclusion page.

ELIMINATION PERIOD:  90 calendar days of Disability caused by the same or a related Sickness or Injury, which must be accumulated within a 180 calendar day period.

CORE BENEFIT
**MAXIMUM BENEFIT PERIOD:** (For Sickness, Injury, or Pre-Existing Conditions):

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than Age 68 | 2 years |
| 68 - 69 | To Age 70 |
|  | (but not less than 1 year) |
| 70 and Over | 1 year |

BUY-UP BENEFIT
**MAXIMUM BENEFIT PERIOD:** (For Sickness, Injury, or Pre-Existing Conditions):    The Insured Employee's Social Security Normal Retirement Age, or the Maximum Benefit Period shown below (whichever is later).

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than Age 60 | To Age 65 |
| 60 | 60 months |
| 61 | 48 months |
| 62 | 42 months |
| 63 | 36 months |
| 64 | 30 months |
| 65 | 24 months |
| 66 | 21 months |
| 67 | 18 months |
| 68 | 15 months |
| 69 and Over | 12 months |

GL3001-LTD-SB

04/01/10

SCHEDULE OF BENEFITS (CONTINUED)

OWN OCCUPATION PERIOD means a period beginning at the end of the Elimination Period and ending at the end of the Maximum Benefit Period for Insured Employees.

WAITING PERIOD:     None  (For date insurance begins, refer to "Effective Dates" section)

CONTRIBUTIONS:     Insured employees are not required to contribute to the cost of the Long-Term Disability Core Benefit. Insured employees are required to contribute to the cost of the Long-Term Disability Buy-Up Benefit.

Under the Policy Termination Section on form GL3001-LTD-10, Items (2) and (3) do not apply to the Buy-Up Benefit.  Instead, the Company may terminate the Buy-Up Benefit under this Policy on the due date of any premium if less than 15% of those eligible for coverage are insured.

**\*Any reference to Employer means Cooperative of American Physicians, Inc. (CAP).**

**\*Any reference to Employee means "Member in good standing".**

Member means:
1. A California-licensed physician who is a member in good standing of Cooperative of American Physicians – Mutual Protection Trust (CAP-MPT) and who receives medical liability coverage through Cooperative of American Physicians;
2. Actively At Work at least 30 hours each week (for purposes of the Member definition, Actively at Work will include regularly scheduled days off, availability for patient and physician calls, holidays, or vacation days, so long as the person is capable of Active Work on those days); and
3. A citizen or resident of the United States of America or Canada.

## DEFINITIONS

As used throughout this Policy, the following terms shall have the meanings indicated below. Other parts of this Policy contain definitions specific to those provisions.

**ACTIVE WORK or ACTIVELY-AT-WORK** means an Employee's full-time performance of all main duties of such Employee's occupation at:
1.   the Employer's usual place of business; or
2.   any other business location to which the Employer requires the Employee to travel.

Unless Disabled on the prior workday or on the day of absence, an Employee will be considered Actively at Work on the following days:
1.   a Saturday, Sunday or holiday which is not a scheduled workday;
2.   a paid vacation day or other scheduled or unscheduled non-workday; or
3.   an excused or emergency leave of absence (except a medical leave) of 30 days or less.

**BASIC MONTHLY EARNINGS or PRE-DISABILITY INCOME** means:

1. for a Partner, P.C., Partner, L.L.C., Owner-Employee, Sole Proprietor, or Subchapter S Corporation Shareholder of the Employer, 1/12th of the Insured Employee's annual income during the tax year just prior to the Determination Date. The "Determination Date" is the last day worked just prior to the date the Disability begins. It is figured from earnings reported in the Insured Employee's federal income tax return on:

   a.      Schedule K-1 showing "ordinary income (loss) from trade or business activities" of the Employer;

   b. Form 1040 Schedule C; and

   c. Form W-2 showing wages, tips and other compensation from the Employer.

For an Insured Employee who was a Partner, P.C., Partner, L.L.C., Owner-Employee, Sole Proprietor, or Subchapter S Corporation Shareholder of the Employer for less than the full tax year, it is figured by averaging the monthly income received for the period he or she was a Partner, P.C., Partner, L.L.C., Owner-Employee, Sole Proprietor, or Subchapter S Corporation Shareholder, just prior to the Determination Date.

2. for all other Employees of the Employer, 1/12th of the Insured Employee's annual gross earnings during the calendar year just prior to the Determination Date. The "Determination Date" is the last day worked just prior to the date the Disability begins. It is figured from the income box on the Insured Employee's W-2 form, which reports wages, tips and other compensation from the Employer for federal income tax purposes.

For an Insured Employee who was not employed with the Employer for the full calendar year prior to the Determination Date, it is figured by averaging the monthly gross earnings received during the actual period of employment, as shown in the Employer's financial records.

Basic Monthly Earnings include the Insured Employee's income before taxes and any deductions for pre-tax contributions to a Section 125 Plan; flexible spending account; an Internal Revenue Code (IRC) Section 401(k), 403(b), 408(k), 408(p), or 457 qualified deferred compensation arrangement; or an executive nonqualified deferred compensation arrangement. It does **not** include:
1. any Employer contributions to a deferred compensation plan; or
2. income from a source other than the Employer.

## DEFINITIONS
### (continued)

It will **not** exceed the amount shown in the Employer's financial records, the amount for which premium has been paid, the Maximum Covered Monthly Earnings permitted by [this/the] Policy; whichever is less. Maximum Covered Monthly Earnings equals the Maximum Monthly Benefit divided by the Benefit Percentage shown in the Schedule of Benefits.) [Exception: For purposes of determining the amount of the Partial Disability Monthly Benefit, Basic Monthly Earnings will not exceed the amount shown in the Employer's financial records.

**COMPANY** means The Lincoln National Life Insurance Company, an Indiana corporation, whose Group Insurance Service Office address is 8801 Indian Hills Drive, Omaha, Nebraska 68114-4066.

GL3001-LTD-3 98 CA

04/01/10

## DEFINITIONS
### (continued)

**DAY** or **DATE** means the period of time which begins at 12:01 a.m. and ends at 12:00 midnight, standard time, at the Policyholder's place of business.  When used with regard to effective dates, it means 12:01 a.m. When used with regard to termination dates, it means 12:00 midnight.

**DISABLED** or **DISABILITY** means Totally Disabled and/or Partially Disabled.

**ELIGIBILITY WAITING PERIOD** means the period of time that:
1. begins with an Employee's most recent date of employment with the Employer; and
2. ends on the day prior to the day such Employee is eligible for coverage under this Policy.

**ELIMINATION PERIOD** means the number of days of Disability during which no benefit is payable.  The Elimination Period is shown in the Schedule of Benefits.  It applies as follows.
1. The Elimination Period:
   (a) begins on the first day of Disability; and
   (b) is satisfied when the required number of days is accumulated within a period which does not exceed two times the Elimination Period.
   During a period of Disability, the Insured Employee may return to full-time work, at his or her own or any other occupation, for an accumulated number of days not to exceed the Elimination Period.
2. Only days of Disability due to the same or a related Sickness or Injury will count towards the Elimination Period.  Days on which the Insured Employee returns to full-time work will not count towards the Elimination Period.

**EMPLOYEE** means a person:
1. whose employment with the Employer is:
   (a) on a regular full-time basis;
   (b) the person's principal occupation; and
   (c) for regular wage or salary;
2. who is regularly scheduled to work at such occupation at least the minimum number of hours shown in the Schedule of Benefits; and
3. who is a member of an Eligible Class which is eligible for coverage under this Policy;
4. who is not a temporary or seasonal employee; and
5. who is a citizen of the United States or legally works in the United States.

**EMPLOYER** means the Policyholder and includes any division, subsidiary or affiliated company named in the Application.

**EVIDENCE OF INSURABILITY** means a statement of proof of an Employee's medical history.  The Company uses this to determine his or her acceptance for insurance, or for an increased amount of insurance. Such proof will be provided at the Employee's own expense, for an Employee who declines or fails to enroll within 31 days of first becoming eligible.

## DEFINITIONS
### (continued)

**FAMILY OR MEDICAL LEAVE** means a leave of absence which is approved in writing by the Employer; and which is subject to:
1.  the federal Family and Medical Leave Act of 1993, and any amendments to it; or
2.  any similar state law requiring the Employer to grant family or medical leaves.

**INSURED EMPLOYEE** means an Employee for whom Policy coverage is in effect.

**INJURY** means bodily injury which is caused by and results directly from an accident, independently of all other causes.  For purposes of determining benefits under this Policy, a Disability will be considered due to an Injury only if:
1.  the Disability begins within 90 days after the Injury; or
2.  the Injury occurred while the Employee was insured under this Policy.

The term "Injury" shall **not** include any:
1.  condition to which a physical or mental sickness, the natural progression of a sickness, or the treatment of a sickness is a substantial contributing factor (based upon the preponderance of medical evidence);
2.  condition caused solely by emotional stress or mental trauma;
3.  repetitive trauma condition which results from repetitious, physically traumatic activities that occur over time;
4.  pregnancy; except for complications which result from a covered Injury;
5.  condition caused by infection; except pyogenic bacterial infection of a covered Injury; or
6.  condition caused by medical or surgical treatment; except when the treatment is needed solely because of a covered Injury.

## DEFINITIONS
### (continued)

**MAIN DUTIES** or **MATERIAL AND SUBSTANTIAL DUTIES** means those job duties which:
1.  are normally required to perform the Insured Person's regular occupation; and
2.  cannot reasonably be modified or omitted.

It includes those main duties as performed in the usual and customary way in the general workforce; **not** as performed for a certain firm or at a certain work site.

**MEDICALLY APPROPRIATE TREATMENT** means diagnostic services, consultation, care or services which are consistent with the symptoms or diagnosis causing the Insured Employee's Disability.  Such treatment must be rendered:
1.  by a Physician whose license and any specialty are consistent with the disabling condition; and
2.  according to generally accepted, professionally recognized standards of medical practice.

**MONTHLY BENEFIT** means the amount payable monthly by the Company to the Insured Employee who is Totally or Partially Disabled.

**OWN OCCUPATION PERIOD** means a period as shown in the Schedule of Benefits.

**PARTIALLY DISABLED** or **PARTIAL DISABILITY** shall be as defined in the Partial Disability Monthly Benefit sections.

**PARTIAL DISABILITY EMPLOYMENT** means the Insured Employee is working at his or her own or any other occupation; but because of a Partial Disability:
1.  the Insured Employee's hours or production is reduced;
2.  one or more main duties of the job are reassigned; or
3.  the Insured Employee is working in a lower-paid occupation.

His or her current earnings must be at least 20% of Predisability Income, and may not exceed the percentage specified in the Partial Disability Benefit section.

**PHYSICIAN** means:
1.  a legally qualified medical doctor who is licensed to practice medicine, to prescribe and administer drugs, or to perform surgery; or
2.  any other duly licensed medical practitioner who is deemed by state law to be the same as a legally qualified medical doctor.

The medical doctor or other medical practitioner must be acting within the scope of his or her license; and must be qualified to provide medically appropriate treatment for the Insured Employee's disabling condition.

Physician does **not** include the Insured Employee or a relative of the Insured Employee receiving treatment. (Relatives include the Insured Employee's spouse, siblings, parents, children and grandparents; and his or her spouse's relatives of like degree.)

**POLICY** means this Group Long Term Disability Insurance Policy issued by the Company to the Policyholder.

**POLICYHOLDER** means the person, individual, firm, trust or other organization as shown on the Face Page of this Policy.

**PREDISABILITY INCOME** - See Basic Monthly Earnings.

## DEFINITIONS
### (continued)

**REGULAR CARE OF A PHYSICIAN** or **REGULAR ATTENDANCE OF A PHYSICIAN** means the Insured Employee:

1. personally visits a Physician, as often as medically required according to standard medical practice to effectively manage and treat his or her disabling condition; and
2. receives medically appropriate treatment, by a Physician whose license and any specialty are consistent with the disabling condition.

**REGULAR OCCUPATION** or **OWN OCCUPATION** means the occupation, trade or profession:

1. in which the Insured Employee was employed with the Employer prior to Disability; and
2. which was his or her primary source of earned income prior to Disability.

It includes any work in the same occupation for pay or profit; whether such work is with the Employer, with some other firm or on a self-employed basis. It includes the main duties of that occupation as performed in the usual and customary way in the general workforce; **not** as performed for a certain firm or at a certain work site.

**SICK LEAVE** or **ANY SALARY CONTINUANCE PLAN** means a plan which:

1. is established and maintained by the Employer for the benefit of Insured Employees; and
2. continues payment of all or part of an Insured Employee's Predisability Income for a specified period after he or she becomes Disabled.

It does **not** include compensation the Employer pays an Insured Employee for work actually performed during a Disability.

**SICKNESS** means illness, pregnancy or disease.

**TOTAL COVERED PAYROLL** means the total amount of Basic Monthly Earnings for all Employees insured under this Policy.

**TOTAL DISABILITY or TOTALLY DISABLED** shall be defined in the Total Disability Monthly Benefit section.

# GENERAL PROVISIONS

**ENTIRE CONTRACT.** The entire contract between the parties shall consist of:
1. this Policy and the Application (a copy of which is attached);
2. the Employer's Participation Agreement, if any; and
3. the Insured Employee's enrollment forms, if any.

In the absence of fraud, all statements made by the Policyholder and by Insured Employees are representations and not warranties. No statement made by an Insured Employee will be used to contest the coverage provided by this Policy; unless a copy of the statement has been furnished to such Insured Employee.

**AUTHORITY TO MAKE OR AMEND CONTRACT.** Only a Company Officer located in the Company's Group Insurance Service Office has the authority to:
1. determine the insurability of a group or any individual within a group;
2. make a contract in the Company's name;
3. amend or waive any provision of this Policy; or
4. extend the time for payment of any premium.

No change in this Policy will be valid; unless it is made in writing and signed by such a Company Officer.

**INCONTESTABILITY.** Except for the non-payment of premiums or fraud, the Company may not contest the validity of this Policy as to any Insured Employee, after it has been in force for two years during his or her lifetime.

**RESCISSION.** The Company has the right to rescind any insurance for which evidence of insurability was required, if:
1. an Insured Employee incurs a claim during the first two years of coverage; and
2. the Company discovers that the Insured Employee made a material misrepresentation on his or her enrollment form.

A material misrepresentation is an incomplete or untrue statement that caused the Company to issue coverage which it would have disapproved, had it known the truth. To rescind means to cancel insurance back to its effective date. In that event, the Company will refund all premium paid for the rescinded insurance, less any benefits paid for the Insured Employee's Disability. The Company reserves the right to recover any claims paid in excess of such premiums.

**NON-PARTICIPATION.** This is a non-participating Policy. It will not share in the divisible surplus of the Company.

**INFORMATION TO BE FURNISHED.** The Employer is required to furnish the Company any information needed to administer this Policy, including:
1. information about Employees who become eligible for insurance; whose amounts of coverage change; and whose eligibility or coverage ends;
2. occupational information and other facts that may be needed to manage a claim; and
3. any other information that the Company may reasonably require.

The Company may inspect any of the Employer's records which relate to this Policy, at any reasonable time.

Clerical error by the Employer:
1. will not affect insurance which otherwise would be in effect; and
2. will not continue insurance which otherwise would be terminated.

Once an error is discovered, an equitable adjustment in premium will be made. If a premium adjustment involves the return of unearned premium, the amount of the return will be limited to the 12-month period which precedes the date the Company receives proof that such an adjustment should be made.

## GENERAL PROVISIONS
### (continued)

MISSTATEMENTS OF FACTS.  If relevant facts about any person were misstated:
1.   a fair adjustment of the premium will be made; and
2.   the true facts will decide if and in what amount insurance is valid under this Policy.

If an Insured Employee's age has been misstated; then any benefits shall be in the amount the paid premium would have purchased at the correct age.

ACTS OF THE POLICYHOLDER.  In administering this Policy, the Policyholder must:
1.   treat Employees the same in like situations; and
2.   allow the Company, without inquiry, to rely on its acts.

POLICYHOLDER'S AGENCY.  For all purposes of this Policy, the Policyholder acts on its own behalf or as Agent of the Employee.  Under no circumstances will the Policyholder be deemed the Agent of the Company.

CERTIFICATES.  The Employer will be furnished with individual Certificates for delivery to each Insured Employee.  These Certificates summarize the benefits provided by this Policy.  If there is a conflict between this Policy and the Certificate, this Policy will control.

CONFORMITY WITH STATE STATUTES.  If, on its effective date, any provision of this Policy conflicts with any applicable law; then the provision will be deemed to conform to the minimum requirements of the law.

CURRENCY.  In administering this Policy, all Predisability Income will be expressed in U.S. dollars; and all premium and benefit amounts must be paid in U.S. dollars.

WORKERS' COMPENSATION OR STATE DISABILITY INSURANCE.  This Policy does not replace or provide benefits required by Workers' Compensation laws or any state disability insurance plan laws.

ASSIGNMENT.  The rights and benefits under this Policy may not be assigned.

# CLAIMS PROCEDURES

**NOTICE OF CLAIM.** Written notice of claim must be given during the Elimination Period. The notice must be sent to the Company's Group Insurance Service Office. It should include:
1. the Insured Employee's name and address; and
2. the number of this Policy.

If this is not possible, written notice must be given as soon as it is reasonably possible.

**CLAIM FORMS.** When notice of claim is received, the Company will send claim forms to the Insured Employee. If the Company does not send the forms within 15 days; then the Insured Employee may send the Company written proof of Disability in a letter. It should state the date the Disability began, its cause and degree. The Company will periodically send the Insured Employee additional Claim Forms.

**PROOF OF CLAIM.** The Company must be given written proof of claim within 90 days after the end of the Elimination Period. When it is not reasonably possible to give written proof in the time required, the claim will not be reduced or denied solely for this reason; if the proof is filed:
1. as soon as reasonably possible; and
2. in no event later than one year after it was required.

These time limits will not apply while an Insured Employee lacks legal capacity.

Proof of claim must be provided at the Insured Employee's own expense. It must show the date the Disability began, its cause and degree. Documentation must include:
1. completed statements by the Insured Employee and the Employer;
2. a completed statement by the attending Physician, which must describe any restrictions on the Insured Employee's performance of the duties of his or her regular occupation;
3. proof of any other income received;
4. proof of any benefits available from other income sources, which may affect Policy benefits;
5. a signed authorization for the Company to obtain more information; and
6. any other items the Company may reasonably require in support of the claim.

Proof of continued Disability, regular care of a Physician, and any other income benefits affecting the claim must be given to the Company, upon request. This must be supplied within 45 days after the Company requests it. If it is not, benefits may be denied or suspended.

**EXAM OR AUTOPSY.** At anytime while a claim is pending, the Company may have the Insured Employee examined:
1. by a Physician, specialist or vocational rehabilitation expert of the Company's choice;
2. as often as reasonably required.

The Company may deny or suspend benefits for an Insured Employee who fails to attend an exam or to cooperate with the examiner, without good cause. The Company may also have an autopsy done, where it is not forbidden by law. Any such exam or autopsy will be at the Company's expense.

**TIME OF PAYMENT OF CLAIMS.** When the company receives proof of claim, benefits payable under this Policy will be paid immediately after the Company receives complete proof of claim and confirms liability. After that:
1. Any Long Term Disability benefits will be paid monthly, during any period for which the Company is liable. If benefits are due for less than a month; then they will be paid on a pro rata basis. The daily rate will equal 1/30 of the monthly benefit.
2. Any balance, which remains unpaid at the end of the period of liability, will be paid within 15 days after the Company receives complete proof of claim and confirms liability.

## CLAIMS PROCEDURES
### (continued)

**Interest on Late Claims.**   Any disability income benefits will accrue interest from the 31st day, if the Company fails to:
1.   send a delay notice, within 30 days after receiving the initial proof of claim; or
2.   make a disability income benefit payment or send a notice of its claim decision, within 30 days after receiving complete proof of claim and enough information to determine liability.

In that event, simple interest will accrue at the rate of 10% per year.   But interest will not accrue while the Company is waiting for relevant information requested from the Insured Employee, the Employer, or a health care provider; or is investigating a report of possible fraud.

**TO WHOM PAYABLE.**   All benefits are payable to the Insured Employee, while living.   After his or her death, benefits will be payable as follows.
1.   Any Survivor Benefit will be payable in accord with that section.
2.   Any other benefits will be payable to the Insured Employee's estate.

If a benefit becomes payable to the Insured Employee's estate, a minor or any other person who is not legally competent to give a valid receipt; then up to $2,000 may be paid to any relative of the Insured Employee that the Company finds entitled to payment.   If payment is made in good faith to such a relative; then the Company will not have to pay that benefit again.

**NOTICE OF CLAIM DECISION.**   The Company will send the Insured Employee a written notice of its claim decision.   If the Company denies any part of the claim; then the written notice will explain:
1.   the reason for the denial, under the terms of this Policy and any internal guidelines;
2.   whether more information is needed to support the claim; and
3.   how the Insured Employee may request a review of the decision by the Company, or by the state Department of Insurance.   It will include the address and phone number of their consumer complaint unit.

This notice will be sent within 15 days after the Company receives complete proof of claim and enough information to determine liability.   It will be sent within 45 days after the Company receives the first proof of claim, if reasonably possible.

**Delay Notice.**   If the Company needs more than 15 days to process the claim, due to matters beyond its control; then an extension will be permitted.   If needed, the Company will send the Insured Employee a written delay notice:
1.   by the 15th day after receiving the first proof of claim; and
2.   every 30 days after that, until the claim is resolved.

The notice will explain:
1.   what additional information is needed to resolve the claim; and
2.   when a decision can be expected.

If the Insured Employee does not receive a written decision by the 105th day after the Company receives the first proof of claim; then there is a right to an immediate review, as if the claim was denied.

**Exception:**   If the Company needs more information from the Insured Employee to process the claim; then it must be supplied within 45 days after the Company requests it.   The resulting delay will not count towards the above time limits for claim processing.

## CLAIMS PROCEDURES
### (continued)

**REVIEW PROCEDURE.** Within 180 days after receiving a denial notice, the Insured Employee may request a claim review by sending the Company:
1.   a written request; and
2.   any written comments or other items to support the claim.
The Insured Employee may review certain non-privileged information relating to the request for review.

The Company will review the claim and send the Insured Employee a written notice of its decision.   The notice will state the reasons for the Company's decision, under the terms of this Policy and any internal guidelines.   If the Company upholds the denial of all or part of the claim; then the notice will also describe:
1.   any further appeal procedures available under this Policy;
2.   the right to access relevant claim information; and
3.   the right to request a state insurance department review, or to bring legal action.
This notice will be sent within 45 days after the Company receives the request for review; or within 90 days, if a special case requires more time.

**Exception:** If the Company needs more information from the Insured Employee to process an appeal; then it must be supplied within 45 days after the Company requests it.   The resulting delay will not count towards the above time limits for appeal processing.

**Claims Subject to ERISA** (Employee Retirement Income Security Act of 1974).   Before bringing a civil legal action under the federal labor law known as ERISA, an employee benefit plan participant must exhaust available administrative remedies.     Under this Policy, the Insured Employee must first seek two administrative reviews of the adverse claim decision, in accord with this provision.   If an ERISA claimant brings legal action under Section 502(a) of ERISA after the required reviews; then the Company will waive any right to assert that he or she failed to exhaust administrative remedies.

**RIGHT OF RECOVERY.** If benefits have been overpaid on any claim; then full reimbursement to the Company is required within 60 days.   If reimbursement is not made; then the Company has the right to:
1.   reduce future benefits until full reimbursement is made; and
2.   recover such overpayments from the Insured Employee or his or her estate.

Such reimbursement is required whether the overpayment is due to:
1.   the Company's error in processing a claim;
2.   the Insured Employee's receipt of Other Income Benefits;
3.   fraud or any other reason.

**LEGAL ACTIONS.**   No legal action to recover any benefits may be brought until sixty days after the required written proof of claim has been given.   No legal action may be brought more than three years after the date written proof of claim is required.

## ELIGIBILITY

**ELIGIBLE CLASSES.**   The classes of Employees eligible for insurance are shown in the Schedule of Benefits.  The Company has the right to review and terminate any or all classes eligible under this Policy, if any class ceases to be covered by this Policy.

**ELIGIBILITY DATE.**  An Employee becomes eligible for coverage provided by this Policy on the later of:
1.    the Policy's effective date; or
2.    the date the Employee satisfies the Waiting Period.

Prior service in an Eligible Class will apply toward the Waiting Period, when:
1.    a former Employee is rehired within one year after his or her employment ends; or
2.    an Employee returns from a Family or Medical Leave within the leave period required by federal or state law (whichever is greater).

## EFFECTIVE DATES

**EFFECTIVE DATE.**  Except as stated in the Delayed Effective Date provision, coverage for an Employee becomes effective at 12:01 a.m. on the latest of:
1.    the date the Employee becomes a member of CAP;
2.    the date the Employee makes written application for coverage; and signs:
    (a)    a payroll deduction order, if the Employees pay any part of the Policy premiums; or
    (b)    an order to pay premiums from the Employee's Flexible Benefits Plan account, if premiums are paid through such an account; or
3.    the date the Company approves the Employee's evidence of insurability, if required.

Evidence of insurability satisfactory to the Company must be submitted (at the Employee's expense) if:
1.    written application for coverage (or an increased amount of coverage) is made more than 60 days after the Employee becomes eligible for such coverage;
2.    coverage is elected after the Employee has requested:
    (a)    to terminate the insurance;
    (b)    to stop payroll deductions for the insurance; or
    (c)    to stop premium payments through a Flexible Benefits Plan account;
3.    coverage is elected after the Employee has caused insurance to lapse by failing to pay the required premium when due; or
4.    optional, supplemental, voluntary or Buy-Up Benefit coverage is elected in excess of any guaranteed issue amounts shown in the Schedule of Benefits.

**DELAYED EFFECTIVE DATE.**  An Employee's Effective Date of any initial, increased or additional coverage will be delayed; if such Employee is not Actively-at-Work on the date that coverage would otherwise be effective.  Coverage will take effect on the Employee's second consecutive day of Active Work.

GL3001-LTD-9 94

04/01/10

**EFFECTIVE DATE FOR CHANGE IN ELIGIBLE CLASS.** An Insured Employee may become a member of a different Eligible Class. Except as stated in the Delayed Effective Date provision, coverage under the different Eligible Class will be effective:

1. immediately, if the different Eligible Class involves any reduction in coverage; or
2. the first day of the month after the Insured Employee has been Actively-at-Work for at least 15 days, as a member of a different Eligible Class; if the different Eligible Class involves enhancement of any coverage.

**REINSTATEMENT AFTER FAMILY OR MEDICAL LEAVE.** A new Waiting Period and evidence of insurability will be waived for an Employee, upon return from an approved Family or Medical Leave, provided:

1. the Employee returns within the leave period required by federal or state law (whichever is greater);
2. the Employee applies for insurance or is enrolled under this Policy within 31 days after resuming Active Work; and
3. the reinstated amount of insurance does not exceed the amount which terminated.

If the above conditions are met, the months of leave will count towards any unmet Pre-Existing Condition Exclusion period; and a new Pre-Existing Condition Exclusion will not apply to the reinstated amount of insurance. A new Pre-Existing Condition Exclusion will apply to any increased amount of insurance, however.

## INDIVIDUAL TERMINATION

**INDIVIDUAL TERMINATION OF COVERAGE.** An Insured Employee's coverage will terminate at 12:00 midnight on the earliest of:

1. the date this Policy or the Employer's participation terminates; but without prejudice to any claim incurred prior to termination;
2. the date the Insured Employee's Class is no longer eligible for insurance;
3. the date such Insured Employee ceases to be a member of an Eligible Class;
4. the end of the period for which the last required premium has been paid; or
5. the date on which the Insured Employee's employment with the Employer terminates; unless coverage is continued as provided below.

**CONTINUATION.** Ceasing Active Work is deemed termination of employment; but insurance may be continued as follows.

1. **Disability.** If an Insured Employee is absent due to Total Disability, or is engaged in Partial Disability Employment; then Long Term Disability insurance may be continued during:
   (a) the Elimination Period; provided the Company receives the required premium from the Employer; and
   (b) the period for which Long Term Disability benefits are payable, without payment of premium.

2. **Family or Medical Leave.** If an Insured Employee goes on an approved Family or Medical Leave, and is not entitled to continue insurance due to Disability, as provided above; then Long Term Disability insurance may be continued, until the earliest of:
   (a) the end of the leave period approved by the Employer;
   (b) the end of the leave period required by federal or state law (whichever is greater);
   (c) the date the Insured Employee notifies the Employer that he or she will not return; or
   (d) the date the Insured Employee begins employment with another employer;
   provided the Company receives the required premium from the Employer.

3. **Lay-off or Other Leave.** When an Insured Employee goes on a temporary lay-off, or an approved leave of absence which is not subject to the federal Family and Medical Leave Act (or any similar state law); then Long Term Disability insurance may be continued:
   (a) until the end of the calendar month following the month in which the lay-off or leave began;
   (b) provided the Company receives the required premium from the Employer.

The Employer must not act so as to discriminate unfairly among Employees in similar situations. Insurance may not be continued when an Insured Employee ceases Active Work due to a labor dispute, strike, work slowdown or lockout.

**INDIVIDUAL TERMINATION DURING DISABILITY.** Termination of an Insured Employee's coverage during a Disability will have no effect on benefits payable for that period of Disability.

# POLICY TERMINATION

**POLICY TERMINATION BY THE COMPANY.**  Until the premium rate has been in effect for at least 12 months, or any later Rate Guarantee Date agreed upon by the Company; the Company may terminate this Policy on the due date of any premium if:

1. the number of Insured Employees totals less than 10;
2. part of the premium is paid by the Insured Employee and less than 75% of those eligible for coverage are insured;
3. all of the premium is paid by the Policyholder and less than 100% of those eligible for coverage are insured;
4. the Policyholder fails to promptly furnish any information which the Company may reasonably require;
5. the Policyholder, without good cause, fails to perform its duties pertaining to this Policy in good faith.
6. the Company's liability is changed as a result of any change in federal, state or local law which affects this Policy;
7. the Policyholder or any covered division, subsidiary or affiliated company relocates;
8. the Policyholder or any covered subsidiary or affiliated company dissolves or merges;
9. a division, subsidiary or affiliated company is added to or removed from this Policy;
10. any coverage for one or more classes of Insured Employees ceases to be provided under this Policy;
11. the number of Insured Employees changes by 25% or more from the number of Insured Employees on the date this Policy took effect, or the most recent Rate Guarantee Date expired, if later; or
12. the Employer ceases to be covered under the state Workers' Compensation program or any other program of like intent.

After the premium rate has been in effect for at least 12 months, or any later Rate Guarantee Date agreed upon by the Company; the Company may terminate this Policy on the due date of any premium.  Such termination may be with respect to the Policy as a whole, to any coverage(s) provided under it, or to any class of Insured Employees covered under it.

The Company will give the Policyholder at least 31 days' advance written notice of its intent to terminate this Policy.

**POLICY TERMINATION BY THE POLICYHOLDER.**  The Policyholder may terminate this Policy at any time by giving the Company written notice.  This Policy will then terminate on:

1. the date the Company receives the notice; or
2. some later date on which the Policyholder and the Company have agreed.

However, termination will not become effective during any period for which premium has been paid to the Company.  The Policyholder remains liable for the payment of premiums to the date of termination.

**AUTOMATIC POLICY TERMINATION.**  If any premium is not paid before the end of the Grace Period; then this Policy will terminate at the end of the Grace Period, without any action on the Company's part.  The Policyholder remains liable for the payment of premiums to the date of termination.

**POLICY TERMINATION DURING DISABILITY.**  Termination of this Policy or an Employer's participation during a Disability shall have no effect on benefits payable to the Insured Employee for that period of Disability.

GL3001-LTD-10 98 CA

04/01/10

## PREMIUMS AND PREMIUM RATES

**PAYMENT OF PREMIUM.**  No coverage provided by this Policy will be in effect until the first premium for such coverage is paid.  For coverage to remain in effect, the Employer must pay each subsequent premium on or before its due date at the Company's Group Insurance Service Office.  The premium must be paid in U.S. dollars.

**PREMIUM RATES.**  The initial premium rates for this Policy are shown on the Face Page of this Policy. Premium rates are subject to change.

**PREMIUM RATE CHANGE.**  The Company may change any premium rate:
1. when this Policy's terms are changed:
   a. as agreed upon by the Policyholder and the Company; or
   b. as a result of a change in federal, state or local law which affects this Policy;
2. when the Company's liability is changed as a result of a change in federal, state, or local law;
3. when the Policyholder or any covered division, subsidiary or affiliated company relocates;
4. when a division, subsidiary, or affiliated company is added to or removed from this Policy;
5. when the number of Insured Employees changes by 25% or more from the number of Insured Employees on the date this Policy took effect or the most recent Rate Guarantee Date expired, if later;
6. when the Employer ceases to be covered by the state Workers' Compensation program or any other program of like intent; or
7. on any premium due date on or after:
   a. this Policy's first anniversary; or
   b. any later Rate Guarantee Date agreed upon by the Company.

Unless the Company and the Group Policyholder agree otherwise, the Company will give at least 45 days' advance written notice of any increase in premium rates.

**MONTHLY PREMIUM AMOUNT.**  The amount of monthly premium due on each due date will be the Total Covered Payroll multiplied by the premium rate.  Changes will not be pro-rated daily.  Instead, premium will be adjusted as follows.
1. When an Insured Employee's insurance (or increased amount of insurance) takes effect, premium will be charged from the monthly due date coinciding with or next following that change.
2. When all or part of an Insured Employee's insurance terminates, the applicable premium will cease on the monthly due date coinciding with or next following that termination.
3. When premiums are paid other than monthly, increases or decreases will result in an adjustment from the premium due date coinciding with or next following that change.

The above manner of charging premium is for accounting purposes only.  It will not extend insurance coverage beyond a date it would have otherwise terminated.

Each premium payment will include any adjustments in past premiums, which are needed due to changes that have not yet been taken into account.  If a premium adjustment involves a return of unearned premium, the amount of the return will be limited to the prior 12-month period.

**GRACE PERIOD.**  A Grace Period of 31 days from the due date will be allowed for the payment of each premium after the first.  This Policy will remain in effect during the Grace Period.  The Policyholder will be liable to the Company for the payment of all premiums due for the period this Policy remains in effect, however.

**WAIVER OF PREMIUM.**  Premium will be administered as follows during any period for which benefits are payable.
1. Long Term Disability premium payments are waived for an Insured Employee who is Disabled, during any period for which benefits are payable.
2. If coverage is to be continued following a period during which premiums were waived; then premium payments must be resumed, as they become due.

## TOTAL DISABILITY MONTHLY BENEFIT

**BENEFIT.** The Company will pay a Total Disability Monthly Benefit to an Insured Employee, after the completion of the Elimination Period; if he or she:
1. is Totally Disabled;
2. is under the regular care of a Physician; and
3. at his or her own expense, submits proof of continued Total Disability and Physician's care to the Company upon request.

The Total Disability Monthly Benefit will cease on the earliest of:
1. the date the Insured Employee ceases to be Totally Disabled or dies;
2. the date the Maximum Benefit Period ends;
3. the date the Insured Employee is able, but chooses not to engage in Partial Disability Employment:
   a. in his or her regular occupation, during the Own Occupation Period; or
   b. in any gainful occupation, after the Own Occupation Period;
4. the date the Insured Employee fails to take a required medical exam, without good cause; or
5. the 60th day after the Company mails a request for additional proof, if not given.

**AMOUNT.** The amount of the Total Disability Monthly Benefit equals:
1. the Insured Employee's Basic Monthly Earnings multiplied by the Benefit Percentage (limited to the Maximum Monthly Benefit); minus
2. Other Income Benefits.

The amount of the Total Disability Monthly Benefit will not be less than the Minimum Monthly Benefit. The Benefit Percentage, Maximum Monthly Benefit, Minimum Monthly Benefit and Maximum Benefit Period are shown in the Schedule of Benefits.

## DEFINITION

**"Total Disability" or "Totally Disabled"** will be defined as follows.
1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of his or her regular occupation.
2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of any gainful occupation which his or her training, education or experience will reasonably allow.

The loss of a professional license, an occupational license or certification, or a driver's license for any reason does **not**, by itself, constitute Total Disability.

## PROGRESSIVE INCOME BENEFIT

**EFFECTIVE DATE.** An Insured Employee will become insured for the Progressive Income Benefit on:
1. the effective date of his or her coverage for Long Term Disability Benefits under this Policy; or
2. the effective date of this provision, if it is added later by amending this Policy.

**Exception:** The effective date will be delayed for an Insured Employee who is unable to perform one or more Activities of Daily Living or suffers from a Cognitive Impairment on that date. In that event, the Insured Employee will become insured for this benefit on the first day he or she:
1. is able to safely and completely perform all of the Activities of Daily Living without another person's active, hands-on help; or
2. no longer suffers from a Cognitive Impairment.

**BENEFIT.** After completion of the Elimination Period shown in the Schedule of Insurance, the Company will pay an additional monthly benefit to an Insured Employee; if he or she:
1. is receiving Total Disability or Partial Disability Monthly Benefits under this Policy; and
2. submits proof of suffering the Loss of Activities of Daily Living or a Cognitive Impairment (as defined below).

Proof must be submitted at the Insured Employee's own expense.

**AMOUNT.** The amount of the Progressive Income Benefit:
1. will equal 10% of the Insured Employee's Basic Monthly Earnings; but
2. will not exceed the Maximum Monthly Benefit for Long Term Disability Benefits, or $5,000 per month (whichever is less).

The Maximum Monthly Benefit for Long Term Disability Benefits is shown in the Schedule of Insurance. The Progressive Income Benefit will not be reduced by any Other Income Benefits, or by earnings from any form of employment.

**DURATION.** This Progressive Income Benefit will cease on the earliest of:
1. the date the Insured Employee no longer suffers from the Loss of Activities of Daily Living or Cognitive Impairment (as defined below);
2. the date the Insured Employee is no longer entitled to Total Disability or Partial Disability Monthly Benefits under this Policy;
3. the date the Maximum Benefit Period ends; or
4. the date the Insured Employee dies.

If this Policy includes a Family Income Benefit, the amount paid to the Eligible Surviving Spouse or Children will not increase due to the Insured Employee's receipt of this Progressive Income Benefit.

## DEFINITIONS

**"Loss of Activities of Daily Living"** means that, due to an Injury or Sickness, the Insured Employee has lost the ability to safely and completely perform **two or more** of the following six Activities of Daily Living without another person's active, hands-on help with all or most of the activity.

The six Activities of Daily Living are:
1. **Bathing** - washing self in a tub, in a shower or by sponge bath; with or without equipment.
2. **Dressing** - putting on, taking off, fastening or unfastening garments, any medically necessary braces, or any artificial limbs normally worn.
3. **Toileting** - getting to, from, on and off toilet and performing related personal hygiene.
4. **Transferring** - moving in and out of bed, chair or any wheelchair; with or without equipment such as canes, walkers, crutches, grab bars, other support devices, or mechanical or motorized devices.
5. **Continence** - voluntarily maintaining control of bladder and bowel function; or performing related personal hygiene, including care of any catheter or colostomy bag, if not continent.
6. **Eating** - once food is prepared and made available, getting nourishment into one's body by any means. This includes eating from a table, tray or container (such as a bowl or cup); or using special equipment (such as a feeding tube or intravenous tube).

## PROGRESSIVE INCOME BENEFIT
### (continued)

**"Cognitive Impairment"** means that due to an Injury or Sickness, the Insured Employee:
1. has suffered a permanent deterioration or loss of cognitive or intellectual capacity; and
2. requires another person's active, hands-on help or verbal cues to prevent harm to self or others, due to that impairment.

The impairment must be diagnosed by a Physician, based upon clinical evidence and reliable standardized tests of short or long-term memory; orientation as to person, place and time; and deductive or abstract reasoning. It may result from moderate to severe head trauma, stroke, Alzheimer's disease or other form of irreversible dementia.

**"Mental Sickness,"** as used in this provision, means any emotional, behavioral, psychological, personality, adjustment, mood or stress-related abnormality, disorder, disturbance, dysfunction or syndrome; regardless of its cause. It includes, but is not limited to:
1. schizophrenia or schizoaffective disorder;
2. bipolar affective disorder, manic depression, or other psychosis; and
3. obsessive-compulsive, depressive, panic or anxiety disorders.

These conditions are usually treated by a psychiatrist, a clinical psychologist or other qualified mental health care provider. Treatment usually involves psychotherapy, psychotropic drugs or similar methods of treatment.

Mental Sickness does **not** include irreversible dementia resulting from stroke; trauma; viral infection; Alzheimer's disease; or other conditions which are not usually treated by a mental health care provider using psychotherapy, psychotropic drugs, or similar methods of treatment.

**"Pre-Existing Condition,"** as used in this provision, means a Sickness or Injury for which the Insured Employee received medical treatment, care or services for a diagnosed condition or took prescribed medication for a diagnosed condition in the 3 months immediately prior to the Insured Employee's Effective Date.

## EXCLUSIONS AND LIMITATIONS

**Prior Disability.** This benefit will not be payable during a period of Disability which begins before the Insured Employee's effective date of coverage under this benefit.

**Pre-Existing Conditions.** This benefit will not be payable for a Loss of Activities of Daily Living or Cognitive Impairment:
1. which is caused or substantially contributed to by a Pre-Existing Condition (as defined above) or medical or surgical treatment of a Pre-Existing Condition; and
2. which begins in the first 12 months after the Insured Employee's effective date under this benefit.

**Mental Sickness and Substance Abuse.** This benefit will not be payable during a period of Disability which is caused or contributed to by or results from a Mental Sickness, alcoholism, or voluntary use of a Controlled Substance; unless prescribed by a Physician. Controlled Substances are those defined as such in Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, and any amendments to it.

**Other Provisions.** This benefit will be subject to all of the Definitions, Exclusions, Proof of Claim, Waiver of Premium and other provisions of this Policy.

## PARTIAL DISABILITY MONTHLY BENEFIT

**BENEFIT.** The Company will pay a Partial Disability Monthly Benefit to an Insured Employee, after completion of the Elimination Period, if he or she:

1. is Disabled;
2. is engaged in Partial Disability Employment;
3. is earning at least 20% of Predisability Income when Partial Disability Employment begins;
4. is under the regular care of a Physician; and
5. at his or her own expense, submits proof of continued Partial Disability, Physician's care and reduced earnings to the Company upon request.

The Insured Employee does not have to be Totally Disabled prior to receiving Partial Disability Monthly Benefits. The Elimination Period may be satisfied by days of Total Disability, Partial Disability or any combination thereof.

The Partial Disability Monthly Benefit will cease on the earliest of:

1. the date the Insured Employee ceases to be Partially Disabled or dies;
2. the date the Maximum Benefit Period ends;
3. the date the Insured Employee earns more than:
   a. 99% of Predisability Income, until Partial Disability Monthly Benefits have been paid for 24 months for the same period of Disability; or
   b. 85% of Predisability Income, after Partial Disability Monthly Benefits have been paid for 24 months for the same period of Disability;*
4. the date the Insured Employee is able, but chooses not to work full-time:
   a. in his or her regular occupation, during the Own Occupation Period; or
   b. in any gainful occupation, after the Own Occupation Period;
5. the date the Insured Employee fails to take a required medical exam, without good cause; or
6. the 60th day after the Company mails a request for additional proof, if not given.

*If the Insured Employee's earnings from Partial Disability Employment fluctuate, the Company has the option to average the most recent three months' earnings and continue the claim; provided that average does not exceed the percentage of Predisability Income allowed above. A Monthly Benefit will not be payable for any month during which earnings exceeded that percentage, however.

## DEFINITIONS

**"Full-Time"** means the average number of hours the Insured Employee was regularly scheduled to work, at his or her regular occupation, during the month just prior to:

1. the date the Elimination Period begins; or
2. the date an approved leave of absence begins, if the Elimination Period begins while the Insured Employee is continuing coverage during a leave of absence.

**"Partially Disabled"** or **"Partial Disability"** will be defined as follows.

1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee:
   a. is unable to perform one or more of the main duties of his or her regular occupation, or is unable to perform such duties full-time; and
   b. is engaged in Partial Disability Employment.
2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee:
   a. is unable to perform one or more of the main duties of any gainful occupation which his or her training, education or experience will reasonably allow; or is unable to perform such duties full-time; and
   b. is engaged in Partial Disability Employment.

## PARTIAL DISABILITY MONTHLY BENEFIT
### (Continued)

BENEFIT AMOUNT.  The Partial Disability Monthly Benefit will replace the Insured Employee's Lost Income; provided it does not exceed the Total Disability Monthly Benefit, which would otherwise be payable during Total Disability without the Partial Disability Employment.

Thus, the amount of the Partial Disability Monthly Benefit will equal the lesser of A or B below.

A.   LOST INCOME:  The Insured Employee's Predisability Income, minus all Other Income Benefits (including earnings from Partial Disability Employment).

B.   TOTAL DISABILITY MONTHLY BENEFIT otherwise payable:
  1.   The Insured Employee's Predisability Income multiplied by the Benefit Percentage (limited to the Maximum Monthly Benefit); minus
  2.   Other Income Benefits, except for earnings from Partial Disability Employment.

The Partial Disability Monthly Benefit will never be less than the Minimum Monthly Benefit.  The Benefit Percentage, Maximum Monthly Benefit, Minimum Monthly Benefit, and Maximum Benefit Period are shown in the Schedule of Benefits.

Progressive Calculation

GL3001-LTD-13.4

04/01/10

# OTHER INCOME BENEFITS

OTHER INCOME BENEFITS means those benefits shown below:

1. Any temporary or permanent benefits or awards which the Insured Employee receives under:
   (a)  Worker's or Workmen's Compensation Law;
   (b)  occupational disease law; or
   (c)  any other act or law of like intent.
2. Any disability income benefits which the Insured Employee receives under any compulsory benefit act or law, or any state disability plans.
3. Any disability income benefits which the Insured Employee receives under:
   (a)  any other group plan, sick leave or salary continuance plan of the Employer; or
   (b)  any federal, state, county or municipal retirement system as a result of the Insured Employee's job with the Employer.
4. Any Disability Benefits or Retirement Benefits the Insured Employee receives under a Retirement Plan.
5. Benefits under the United States Social Security Act, the Canada Pension Plan, the Quebec Pension Plan or any similar plan or act as follows:
   (a)  disability or unreduced retirement benefits for which the Insured Employee and any spouse or child receives, because of the Insured Employee's Disability; or
   (b)  reduced retirement benefits received by the Insured Employee and any spouse or child because of the Insured Employee's receipt of reduced retirement benefits.
6. Earnings the Insured Employee earns or receives from any form of employment.

**These Other Income Benefits are benefits resulting from the same Disability for which a Monthly Benefit is payable under this Policy.**

An Insured Employee who may be entitled to some Other Income Benefit is required to actively pursue it; if he or she does not, Policy benefits may be denied or suspended.

COST-OF-LIVING FREEZE.  After the first deduction for each of the Other Income Benefits, the Monthly Benefit will not be further reduced due to any cost-of-living increases payable under these Other Income Benefits.

LUMP SUM PAYMENTS.  Other Income Benefits which are paid in a lump sum will be prorated on a monthly basis over the time period for which the sum is given.  If no time period is stated, the sum will be prorated on a monthly basis over the time the Company expects the Insured Employee to live.

DEFINITIONS.

**DISABILITY BENEFIT** when used with the term Retirement Plan, means a benefit which:
   (1)  is payable under a Retirement Plan due to disability as defined in that plan; and
   (2)  does not reduce the benefits which would have been paid as Retirement Benefits at the normal retirement age under the plan if the disability had not occurred.
If the payment of the benefit does cause such a reduction, the benefit will be deemed a Retirement Benefit as defined in this Policy.

GL3001-LTD-14 98 CA                    25                    Full SS Integ.
                                                            04/01/10

## OTHER INCOME BENEFITS
### (continued)

**RETIREMENT BENEFIT** when used with the term Retirement Plan, means a benefit which:
  (1)   is payable under a Retirement Plan either in a lump sum or in the form of periodic payments;
  (2)   does not represent contributions made by an Employee (payments which represent Employee contributions are deemed to be received over the Employee's expected remaining life regardless of when such payments are actually received); and
  (3)   is payable upon:
    (a)   early or normal retirement; or
    (b)   disability, if the payment does reduce the benefit which would have been paid at the normal retirement age under the plan, if disability had not occurred.

**RETIREMENT PLAN** means a defined benefit or defined contribution plan which provides Retirement Benefits to Employees and which is not funded wholly by Employee contributions.   The term shall **not** include any 401(k), profit-sharing or thrift plan; informal salary continuance plan; individual retirement account (IRA); tax sheltered annuity (TSA); stock ownership plan; or a non-qualified plan of deferred compensation.  An Employer's Retirement Plan is deemed to include any Retirement Plan:
  (1)   which is part of any federal, state, county, municipal or association retirement system; and
  (2)   for which the Employee is eligible as a result of employment with the Employer.

## RECURRENT DISABILITY

"Recurrent Disability" means a Disability due to an Injury or Sickness which is the same as, or related to, the cause of a prior Disability for which Monthly Benefits were payable. A Recurrent Disability will be treated as follows.

1. A Recurrent Disability will be treated as a new period of Disability, and a new Elimination Period must be completed before further Monthly Benefits are payable; if the Insured Employee returns to his or her regular occupation on a full-time basis for six months or more.

2. A Recurrent Disability will be treated as part of the prior Disability, if an Insured Employee returns to his or her regular occupation on a full-time basis for less than six months.

To qualify for a Monthly Benefit, the Insured Employee must earn less than the percentage of Predisability Income specified in the Partial Disability Monthly Benefit section. Monthly Benefit payments will be subject to all other terms of this Policy for the prior Disability.

If an Insured Employee becomes eligible for coverage under any other group Long Term Disability policy, this Recurrent Disability provision will cease to apply to that Insured Employee.

## EXCLUSIONS

GENERAL EXCLUSIONS.  This Policy will not cover any period of Total or Partial Disability:
1.   due to war, declared or undeclared, or any act of war;
2.   due to intentionally self-inflicted injuries;
3.   due to active participation in a riot;
4.   due to the Insured Employee's committing of or the attempting to commit a felony;
5.   during which the Insured Employee is incarcerated for the commission of a felony; or
6.   during which the Insured Employee is not under the regular care of a Physician.

PRE-EXISTING CONDITION EXCLUSION.  This Policy will not cover any Total or Partial Disability:
1.   which is caused or contributed to by, or results from a Pre-Existing Condition; and
2.   which begins in the first 12 months after the Insured Employee's Effective Date.

"Pre-Existing Condition" means a Sickness or Injury for which the Insured Employee received treatment within 3 months prior to the Insured Employee's Effective Date.

"Treatment" means consultation, care or services provided by a Physician.  It includes diagnostic measures and the prescription, refill of prescription, or taking of any prescribed drugs or medicines.

## SPECIFIED INJURIES OR SICKNESSES LIMITATION

**LIMITATION.** If an Insured Employee is Disabled primarily due to one or more of the Specified Injuries or Sicknesses defined below; then Partial or Total Disability Monthly Benefits:
1. will be payable subject to the terms of this Policy; but
2. will be limited to 24 months for any one period of Disability; unless the Insured Employee is confined in a Hospital.

"Specified Injuries or Sicknesses" include any Chronic Fatigue Sickness, Environmental Sickness, Mental Sickness, Musculoskeletal/Connective Tissue Injury or Sickness, or Substance Abuse, as defined below.

**CONDITIONS**
1. If the Insured Employee is confined in a Hospital at the end of the 24th month for which Policy benefits are paid for the Specified Injury or Sickness; then benefits will be payable until he or she is discharged from that facility.
2. In no event will the Monthly Benefit be paid beyond the Maximum Benefit Period shown in the Schedule of Insurance, however.

**DEFINITIONS**

**"Chronic Fatigue Sickness"** means a sickness that is characterized by a debilitating fatigue, in the absence of other known medical or psychological conditions. It includes, but is not limited to:
1. chronic fatigue syndrome or chronic fatigue immunodeficiency syndrome;
2. an Epstein-Barr or herpes 6 viral infection, or post viral syndrome; and
3. limbic encephalopathy or myalgic encephalomyelitis.
It does **not** include depression or any neoplastic, neurologic, endocrine, hematologic or rheumatologic disorder.

**"Environmental Sickness"** means an allergy or sensitivity to chemicals or the environment. It includes, but is not limited to:
1. environmental allergies;
2. sick building syndrome;
3 multiple chemical sensitivity syndrome; and
4. chronic toxic encephalopathy.
It does **not** include asthma or allergy-induced reactive lung disease.

**"Hospital,"** as used in this provision, means:
1. a general hospital which:
   a. is licensed, approved or certified by the state where it is located;
   b. is recognized by the Joint Commission on the Accreditation of Hospitals; or
   c. is operated to treat resident inpatients; has a registered nurse always on duty; and has a lab, x-ray facility and place where major surgery is performed; and
2. a skilled nursing care facility or unit, which provides convalescent or nursing care; and which is recognized as a skilled nursing care facility under Medicare.
The term Hospital also includes:
1. a Mental Hospital when treatment is for a Mental Sickness; and
2. a Treatment Center when treatment is for Substance Abuse.

**"Mental Hospital"** means a health care facility (or its psychiatric unit) which:
1. is licensed, certified or approved as a mental hospital by the state where it is located;
2. is equipped to treat resident inpatients' mental diseases or disorders; and
3. has a resident psychiatrist on duty or on call at all times.

**"Mental Sickness"** means any emotional, behavioral, psychological, personality, adjustment, mood or stress-related abnormality, disorder, disturbance, dysfunction or syndrome; regardless of its cause.  It includes, but is not limited to:
1. schizophrenia or schizoaffective disorder;
2. bipolar affective disorder, manic depression, or other psychosis; and
3. obsessive-compulsive, depressive, panic or anxiety disorders.

These conditions are usually treated by a psychiatrist, a clinical psychologist or other qualified mental health care provider.  Treatment usually involves psychotherapy, psychotropic drugs or similar methods of treatment.

Mental Sickness does not include irreversible dementia resulting from:
1. stroke, trauma, viral infection, Alzheimer's disease; or
2. other conditions which are not usually treated by a mental health care provider using psychotherapy, psychotropic drugs, or similar methods of treatment.

**"Musculoskeletal/Connective Tissue Injury or Sickness"** includes, but is not limited to:
1. scoliosis that does not require surgery;
2. any other disease or disorder of the cervical, thoracic or lumbosacral back and surrounding soft tissue; unless documented by x-ray, electromyogram, computerized tomography or magnetic resonance imaging;
3. sprains or strains of the muscles, joints and adjacent tissues;
4. fibromyalgia, carpal tunnel syndrome, or repetitive motion syndrome; and
5. myofascial pain, or any craniomandibular or temporomandibular joint disorder (TMJ).

It does **not** include:
1. scoliosis that requires surgery, or spondylolisthesis of grade II or higher;
2. radiculopathies or herniated discs that are documented by x-ray, electromyogram, computerized tomography or magnetic resonance imaging;
3. tumors, malignancies, vascular malformations, or osteopathies;
4. myelopathies, myelitis, or demyelinating disease; or
5. lupus, or rheumatoid or psoriatic arthritis.

**"Substance Abuse"** means alcoholism, drug abuse, or chemical dependency of any type.

**"Treatment Center"** means a health care facility (or its medical or psychiatric unit) which:
1. is licensed, certified or approved by the state where it is located;
2. has a program for inpatient treatment of substance abuse; and
3. provides such treatment based upon a written plan approved and supervised by a Physician.

## VOLUNTARY VOCATIONAL REHABILITATION BENEFIT PROVISION

BENEFIT.   If an Insured Employee is Disabled and is receiving Policy benefits; then he or she may be eligible for a Vocational Rehabilitation Benefit.  This Benefit consists of services which may include:
1.   vocational evaluation, counseling, training or job placement;
2.   job modification or special equipment; and
3.   other services which the Company deems reasonably necessary to help the Insured Employee return to work.

The Company will determine the Insured Employee's eligibility and the amount of any Benefit payable.

ELIGIBILITY.   An Insured Employee may be eligible for this Benefit, if the Company finds that he or she:
1.   has a Disability that prevents the performance of his or her regular occupation; and, after the Own Occupation Period, also lacks the skills, training or experience needed to perform any other gainful occupation;
2.   has the physical and mental abilities needed to complete a Program; and
3.   is reasonably expected to return to work after completing the Program; in view of his or her degree of motivation and the labor force demand for workers in the proposed occupation.

The Company must also find that the cost of the proposed services is less than its expected claim liability.

AMOUNT.   The amount of any Vocational Rehabilitation Benefit will not exceed the Company's expected claims liability.  This benefit will not be payable for services covered under the Insured Employee's health care plan or any other vocational rehabilitation program.   Payment may be made to the provider of the services, at the Company's option.

CONDITIONS.   Either the Company, the Insured Employee, or his or her Physician may first propose vocational rehabilitation.   When a Program is approved by the Company, this Policy's definition of "Disability" will be waived during the rehabilitation period; but it will be reapplied after the Program ends.  The Company will determine the amount and duration of any Long Term Disability benefits payable after the Program ends, in accord with Policy provisions.

## DEFINITION

**"Program"** means a written vocational rehabilitation program which describes the Program's goals; each party's responsibilities; and the times, dates and costs of the rehabilitation services.

## REASONABLE ACCOMMODATION BENEFIT

If an Insured Employee of the Employer is Disabled, and is receiving Policy benefits; then the Employer may be eligible for a Reasonable Accommodation Benefit. This Benefit reimburses the Employer for 50% of the expense incurred for reasonable accommodation services for the Insured Employee; but will not exceed:

1. a maximum benefit of $5,000 for any one Insured Employee; or
2. the Company's expected liability for the Insured Employee's Long Term Disability claim (whichever is less).

Such services may include:

1. providing the Insured Employee a more accessible parking space or entrance;
2. removing barriers or hazards to the Insured Employee from the worksite;
3. special seating, furniture or equipment for the Insured Employee's work station;
4. providing special training materials or translation services during the Insured Employee's training; and
5. other services the Company deems reasonably necessary to help the Insured Employee return to work with the Employer.

ELIGIBILITY FOR BENEFIT. The Company will determine the Employer's eligibility to receive the Benefit. To qualify for the Benefit, the Employer must have an Insured Employee:

a. whose Disability prevents the performance of his or her regular occupation at the Employer's worksite;
b. who has the physical and mental abilities needed to perform his or her own or another occupation at the Employer's worksite; but only with the help of the proposed accommodation; and
c. who is reasonably expected to return to work with the help of the proposed accommodation.

The Company must also find that the requested Reasonable Accommodation Benefit is less than the expected liability for the Insured Employee's Long Term Disability claim.

WRITTEN PROPOSAL. The reasonable accommodation services must be provided in accord with a written proposal, which is developed with input from:

1. the Employer;
2. the Insured Employee; and
3. his or her Physician, when appropriate.

The proposal must state the purpose of the proposed accommodation; and the times, dates and costs of the services.

CONDITIONS. Either the Company, the Employer, the Insured Employee, or his or her Physician may first propose an accommodation.

The proposal must be approved by the Company in writing.

The Company will then reimburse the Employer, upon receipt of proof that the Employer:

1. has provided the services for the Insured Employee; and
2. has paid the provider for the services.

GL3001-LTD-17.3

04/01/10

## PRIOR INSURANCE CREDIT UPON TRANSFER OF INSURANCE CARRIERS

To prevent loss of coverage for an Employee because of a transfer of insurance carriers, this Policy will provide Prior Insurance Credit for employees insured under the prior carrier's policy on its termination date as follows.

FAILURE TO BE ACTIVELY-AT-WORK DUE TO INJURY OR SICKNESS.   Subject to premium payments, this Policy will provide coverage to an Employee:
1.   who was insured by the prior carrier's policy at the time of transfer; and
2.   who was not Actively-At-Work due to Injury or Sickness on this Policy's Effective Date.

The coverage will be that provided by the prior carrier's policy, had it remained in force.  The Company will pay:
1.   the benefit that the prior carrier would have paid; minus
2.   any amount for which the prior carrier is liable.

DISABILITY DUE TO A PRE-EXISTING CONDITION.  Benefits may be payable for a Total Disability due to a Pre-Existing Condition for an Employee who:
1.   was insured by the prior carrier's policy at the time of transfer; and
2.   was Actively-At-Work and insured under this Policy on this Policy's Effective Date.

The benefits will be determined as follows:
1.   The Company will apply this Policy's Pre-Existing Condition Exclusion.  If the Insured Employee qualifies for benefits, such Insured Employee will be paid according to this Policy's benefit schedule.
2.   If the Insured Employee cannot satisfy this Policy's Pre-Existing Condition Exclusion, but can satisfy the prior carrier's pre-existing condition exclusion giving consideration towards continuous time insured under both policies; then he or she will be paid in accord with the benefit schedule and all other terms, conditions and limitations of:
     a.   this Policy without applying the Pre-Existing Condition Exclusion; or
     b.   the prior carrier's policy;
     whichever is less.
3.   If the Insured Employee cannot satisfy the Pre-Existing Condition Exclusion of this Policy or that of the prior carrier, no benefit will be paid.

Prior Insurance Credit

## FAMILY INCOME BENEFIT

The Company will pay a lump sum benefit to the Eligible Survivor when proof is received that an Insured Employee died:
1.    after Disability had continued for 180 or more consecutive days; and
2.    while receiving a Monthly Benefit.

The benefit will be equal to three times the Insured Employee's Last Monthly Benefit.

"Last Monthly Benefit" means the gross Monthly Benefit payable to the Insured Employee immediately prior to death.   Any reductions for Other Income Benefits, or for earnings the Insured Employee received for Partial Disability Employment, will not apply.

"Eligible Survivor" means the Insured Employee's:
1.    surviving spouse; or, if none
2.    surviving children who are under age 25 on the Insured Employee's date of death.

If payment becomes due to the Insured Employee's children; then payment will be made to:
1.    the surviving children, in equal shares; or
2.    a person named by the Company to receive payments on the children's behalf.

This payment will be valid and effective against all claims by others representing, or claiming to represent, the children.

Three Month Survivor Benefit

## AMENDMENT 1

**TO BE ATTACHED TO AND MADE A PART OF POLICY NO.:** 000010125650
**ISSUED TO:** Cooperative of American Physicians, Inc.


It is agreed that for physicians the definition of "Total Disability" shown in the "Definitions" section will not apply.  Instead, the definition of "Total Disability" for physicians will be as follows:

TOTAL DISABILITY or TOTALLY DISABLED means that during the elimination period and maximum benefit period, an Insured Employee is unable:
1. to perform all of the main duties of his or her specialty in the practice of medicine on a full-time basis;
2. because of a disability which is caused by injury or sickness and started while the Employee was insured.

"Specialty in the practice of medicine" means that specialty the Insured Employee was practicing immediately prior to the date total disability started.


**The effective date of this amendment is April 1, 2010; but only with respect to disabilities commencing on or after such date.**

**Nothing contained in this amendment shall change any of the terms and conditions of the Policy, except as stated above.**


THE LINCOLN NATIONAL LIFE INSURANCE COMPANY



Officer of the Company


GL3001-AMEND.PHYS. 1

04/01/10

## CALIFORNIA LIFE AND HEALTH INSURANCE
## GUARANTY ASSOCIATION ACT
## SUMMARY DOCUMENT AND DISCLAIMER

Residents of California who purchase life and health insurance and annuities should know that the insurance companies licensed in this state to write these type of insurance are members of the California Life and Health Insurance Guaranty Association ("CLHIGA"). The purpose of this Association is to assure that policyholders will be protected, within limits, in the unlikely event that a member insurer becomes financially unable to meet its obligations. If this should happen, the Guaranty Association will assess its other member insurance companies for the money to pay the claims of insured persons who live in this state and, in some cases, to keep coverage in force. The valuable extra protection provided through the Association is not unlimited, as noted below, and is not a substitute for consumers' care in selecting insurers.

The California Life and Health Insurance Guaranty Association may not provide coverage for the policy. If coverage is provided, it may be subject to substantial limitations or exclusions, and require continued residency in California. You should not rely on coverage by the Association in selecting an insurance company or in selecting an insurance policy.

Coverage is NOT provided for your policy or any portion of it that is not guaranteed by the insurer or for which you have assumed the risk, such as a variable contract sold by prospectus.

Insurance companies or their agents are required by law to give or send you this notice. **However, insurance companies and their agents are prohibited by law from using the existence of the Guaranty Association to induce you to purchase any kind of insurance policy.**

Policyholders with additional questions should first contact their insurer or agent or may then contact:

California Life & Health Insurance      or      Consumer Communications Bureau
Guaranty Association                             California Department of Insurance
P.O. Box 16860                                     300 South Spring Street
Beverly Hills, CA  90209-3319                  Los Angeles, CA  90013

The state law that provides for this safety-net coverage is called the California Life and Health Insurance Guaranty Association Act. Below is a brief summary of this law's coverages, exclusions and limits. This summary does not cover all provisions of the law; nor does it in any way change anyone's rights or obligations under the Act or the rights or obligations of the Association.

## COVERAGE

Generally, individuals will be protected by the California Life and Health Insurance Guaranty Association if they live in this state and hold a life or health insurance contract, or an annuity, or if they are insured under a group insurance contract, issued by a member insurer. The beneficiaries, payees or assignees of insured persons are protected as well, even if they live in another state.

CA NOTICE 96

P/C-L,A&H 05
04/01/10

## EXCLUSIONS FROM COVERAGE

However, persons holding such policies are not protected by this Guaranty Association if:

- Their insurer was not authorized to do business in this state when it issued the policy or contract;
- Their policy was issued by a health care service plan (HMO, Blue Cross, Blue Shield), a charitable organization, a fraternal benefit society, a mandatory state pooling plan, a mutual assessment company, an insurance exchange, or a grants and annuities society;
- They are eligible for protection under the laws of another state.  This may occur when the insolvent insurer was incorporated in another state whose guaranty association protects insureds who live outside that state.

The Guaranty Association also does not provide coverage for:

- Unallocated annuity contracts; that is, contracts which are not issued to and owned by an individual and which guarantee rights to group contractholders, not individuals;
- Employer and association plans, to the extent they are self-funded or uninsured;
- Any policy or portion of a policy which is not guaranteed by the insurer or for which the individual has assumed the risk, such as a variable contract sold by prospectus;
- Any policy of reinsurance unless an assumption certificate was issued;
- Interest rate yields that exceed an average rate;
- Any portion of a contract that provides dividends or experience rating credits.

## LIMITS ON AMOUNT OF COVERAGE

The Act limits the Association to pay as follows:

## LIFE AND ANNUITY BENEFITS

- 80% of what the life insurance company would owe under a life policy or annuity contract up to
- $100,000 in cash surrender values,
- $100,000 in present value of annuities; or
- $250,000 in life insurance death benefits.
- A maximum of $250,000 for any one insured life no matter how many policies and contracts there were with the same company, even if the policies provided different types of coverages.

## HEALTH BENEFITS

- A maximum of $200,000 of the contractual obligations that the health insurance company would owe were it not insolvent.  The maximum may increase or decrease annually based upon changes in the health care cost component of the consumer price index.

## PREMIUM SURCHARGE

Member insurers are required to recoup assessments paid to the Association by way of a surcharge on premiums charged for health insurance policies to which the Act applies.

CA NOTICE 96

P/C-L,A&H 05
04/01/10

# EXHIBIT C

1 | Martin E. Rosen (108998), mrosen@bargerwolen.com
Robert K. Renner (155283), rrenner@bargerwolen.com
2 | BARGER & WOLEN LLP
19800 MacArthur Boulevard, 8th Floor
3 | Irvine, California 92612
Telephone: (949) 757-2800
4 | Facsimile: (949) 752-6313

5 | Attorneys for Defendant
The Lincoln National Life Insurance
6 | Company

7

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **IN AND FOR THE COUNTY OF ORANGE**

10

11 | GILBERT GOODMAN, M.D.,                     ) CASE NO.: 30-2011-00511956
                                             )
12 |            Plaintiff,                     ) **DEFENDANT'S ANSWER TO**
                                             ) **PLAINTIFF'S UNVERIFIED**
13 |     vs.                                   ) **COMPLAINT**
                                             )
14 | THE LINCOLN NATIONAL LIFE                 )
INSURANCE COMPANY; and DOES 1                )
15 | through 10, inclusive,                    )
                                             )
16 |            Defendants.                    )
                                             )
17 | _____ )  Complaint Filed:   September 29, 2011

18

19

20

21

22

23

24

25

26

27

28

i:\office\10564\020\11pleadings\01 answer.doc

DEFENDANT'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT

1    Defendant The Lincoln National Life Insurance Company ("Lincoln National") answers the

2    unverified complaint ("Complaint") of Plaintiff Gilbert Goodman, M.D. ("Plaintiff") as follows:

3

4                                    **ANSWER**

5    1.    Lincoln National, in answer to the Complaint, and by virtue of Section 431.30(d) of

6    the Code of Civil Procedure, hereby files its general denial to the allegations of the Complaint and

7    denies generally and specifically each and every allegation therein. Lincoln National further denies,

8    generally and specifically, that Plaintiff has suffered damages in the sum or sums alleged, or in any

9    other sum or sums alleged, or at all, by reason of any act, breach or omission on the part of Lincoln

10   National, or on the part of any agent, servant or employee of Lincoln National.

11

12   2.    Lincoln National denies that it was or is guilty of any of the conduct as alleged in

13   the Complaint, or otherwise, or at all, and further denies that Plaintiff is or was injured or damaged,

14   or will be injured or damaged, as a result of any conduct on the part of Lincoln National, either as

15   alleged in said Complaint, or otherwise, or at all.

16

17   3.    Lincoln National denies that by reason of any act or acts, or by virtue of any of the

18   allegations contained in Plaintiff's Complaint, or otherwise, that Plaintiff is, was, or will be entitled

19   to any of the relief sought in the Complaint, or otherwise, or at all.

20

21                              **AFFIRMATIVE DEFENSES**

22

23                         FIRST AFFIRMATIVE DEFENSE

24                       (Failure to State a Cause of Action)

25   1.    The Complaint and all causes of action stated therein fail to state facts sufficient to

26   constitute a cause of action or a claim for relief against Lincoln National.

27

28

-1-

1
SECOND AFFIRMATIVE DEFENSE

2
(Failure to Perform)

3     2.    Plaintiff failed to meet or perform all necessary covenants, conditions and/or

4   promises required to be performed in accordance with the terms and conditions of the contract at

5   issue in this action, and he is therefore barred from asserting any claim against Lincoln National.

6

7
THIRD AFFIRMATIVE DEFENSE

8
(Failure to Mitigate)

9     3.    Plaintiff has failed, refused, and/or neglected to take reasonable and/or necessary

10  steps to mitigate any damages allegedly incurred as a result of Lincoln National's alleged conduct,

11  thus barring, or at least reducing, any recovery in this action.

12

13
FOURTH AFFIRMATIVE DEFENSE

14
(Waiver)

15    4.    Plaintiff, by his acts and conduct, has waived his right, if any, to seek the relief

16  requested in the Complaint.

17

18
FIFTH AFFIRMATIVE DEFENSE

19
(Estoppel)

20    5.    Plaintiff, by his acts and conduct, is estopped from alleging any and all claims

21  asserted in the Complaint.

22

23
SIXTH AFFIRMATIVE DEFENSE

24
(Laches)

25    6.    Plaintiff's action is barred by the equitable doctrine of laches.

26

27

28

BARGER & WOLEN LLP
19800 MACARTHUR BLVD.
EIGHTH FLOOR
IRVINE, CA 92612
(949) 757-2800

-2-
DEFENDANT'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT

1                          SEVENTH AFFIRMATIVE DEFENSE

2                                (Unclean Hands)

3        7.      Plaintiff's claims for relief are barred by the equitable doctrine of unclean hands.

4

5                            EIGHTH AFFIRMATIVE DEFENSE

6                            (Statutes of Limitations)

7        8.      Any or all potential recovery on behalf of Plaintiff is barred by the statute of

8 limitations found in the California Code of Civil Procedure, including but not limited to Sections

9 337, 338, 339 and 340.

10

11                            NINTH AFFIRMATIVE DEFENSE

12                         (Acts or Omissions of Others)

13        9.      The injuries and damages alleged by Plaintiff, if any, were the direct and proximate

14 result of the wrongful conduct or other actions of parties other than Lincoln National, including

15 Plaintiff. Accordingly, Lincoln National's liability, if any, is limited in direct proportion to the

16 percentage of fault, if any, actually attributable to Lincoln National.

17

18                            TENTH AFFIRMATIVE DEFENSE

19         (Genuine Dispute Concerning Coverage Under the Policy)

20        10.     Plaintiff's claim for breach of the duty of good faith and fair dealing alleged in the

21 Complaint is barred by the genuine dispute doctrine.

22

23                       ELEVENTH AFFIRMATIVE DEFENSE

24                (ERISA's Application and Preemption)

25        11.     The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.

26 Section 1001 *et seq*., as amended, applies both to Plaintiff's underlying disability claim and to this

27 litigation, such that Plaintiff's state-law claims are completely preempted.

28

BARGER & WOLEN LLP
19800 MACARTHUR BLVD.
EIGHTH FLOOR
IRVINE, CA 92612
(949) 757-2800

-3-

DEFENDANT'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT

1                               TWELFTH AFFIRMATIVE DEFENSE

2                          (Failure to Exhaust Administrative Remedies)

3         12.    Prior to instituting this litigation, Plaintiff failed to exhaust his administrative

4 remedies as set forth in ERISA and/or the documents comprising the employee welfare benefit plan

5 at issue, such that this lawsuit is premature and should accordingly be dismissed.

6

7                           THIRTEENTH AFFIRMATIVE DEFENSE

8                               (Reservation of Defenses)

9         13.    Lincoln National reserves its right to raise additional affirmative defenses and to

10 supplement those asserted herein upon discovery of further information regarding the claims and

11 upon further investigation.

12

13                                     **PRAYER**

14         WHEREFORE, Lincoln National prays for judgment as follows:

15         1.    That Plaintiff take nothing by reason of his Complaint and that same be dismissed;

16         2.    That judgment be entered against Plaintiff and in favor of Lincoln National on the

17 Complaint;

18         3.    For costs of suit incurred herein, including such reasonable attorneys' fees as may be

19 allowed by case or statutory authority and/or agreement of the parties; and

20         4.    For such other and further relief as this Court may deem just and proper.

21

22 Dated: November 3, 2011                BARGER & WOLEN LLP

23

24                                     By:

25                                       MARTIN E. ROSEN

                                      ROBERT K. RENNER

26                                       Attorneys for Defendant

                                      The Lincoln National Life Insurance

27                                       Company

28

-4-

DEFENDANT'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT

1    **CERTIFICATE OF SERVICE**

2    STATE OF CALIFORNIA, COUNTY OF ORANGE

3    I am employed in the County of Orange, State of California.  I am over the age of 18 and not
     a party to the within action; my business address is 19800 MacArthur Blvd., Suite 800, Irvine, CA
4    92612; Facsimile No.: (949) 752-6313.

5    I hereby certify that on November 3, 2011, I served the foregoing documents described as:
     **DEFENDANT'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT** on the interested
6    parties as follows:

7    Michael B. Horrow, Esq.                          Attorneys for Plaintiff
     Donahue & Horrow, LLP                            Gilbert Goodman, M.D.
8    1960 E. Grand Avenue, Suite 1215
     El Segundo, California  90245
9    Tel.:  (310) 322-0300
     Fax:  (310) 322-0302
10   mhorrow@donahuehorrow.com

11
     ☐   **ELECTRONICALLY:** I caused a true and correct copy thereof to be electronically filed
12   using the Court's Electronic Court Filing ("ECF") System and service was completed by electronic
     means by transmittal of a Notice of Electronic Filing on the registered participants of the ECF
13   System.  I served those parties who are not registered participants of the ECF System as indicated
     below.
14
     ☒   I placed the ☐ original ☒ a true copy thereof enclosed in sealed envelope(s) to the parties
15   listed     above     and     caused     such     envelope(s)     to     be     delivered     by
     ☒   **U.S POSTAL SERVICE**     ☐   **OVERNIGHT DELIVERY**.
16
     ☐   **BY E-MAIL:** I electronically transmitted a true and correct copy thereof to the interested
17   parties' electronic notification address(es) of record before close of business for the purpose of
     effecting service and the transmission was reported as complete and without error.
18
     ☐   **FACSIMILE TRANSMISSION:** Based on ☐ court order ☐ agreement of the parties, I
19   caused a true copy thereof to be served by transmitting via facsimile machine to the interested
     parties' facsimile number(s) of record before close of business.  The transmission was reported as
20   complete, without error.

21   ☐   **PERSONAL DELIVERY:** I caused ☐ the original ☐ a true copy thereof to be delivered
     by hand to the interested parties by an employee or independent contractor of a registered process
22   service.

23   I am employed in the office of a member of the bar of this court at whose direction the
     service was made.  I declare under penalty of perjury under the laws of the United States of
24   America and the State of California that the above is true and correct.  Executed at Irvine, California
     on November 3, 2011.
25
26   NAME: Derek Sutter                              _____
                                                     (Signature)
27
28

BARGER & WOLEN LLP
19800 MACARTHUR BLVD.
EIGHTH FLOOR
IRVINE, CA 92612
(949) 757-2800

-5-
DEFENDANT'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT

1    **CERTIFICATE OF SERVICE**

2    STATE OF CALIFORNIA, COUNTY OF ORANGE

3         I am employed in the County of Orange, State of California.  I am over the age
4    of 18 and not a party to the within action; my business address is 19800 MacArthur
     Blvd., Suite 800, Irvine, CA  92612; Facsimile No.: (949) 752-6313.

5         I hereby certify that on November 3, 2011, I served the foregoing documents
     described as: **DEFENDANT THE LINCOLN NATIONAL LIFE INSURANCE**
6    **COMPANY'S NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. §§ 1441(b)**
     **AND 1446; DECLARATION OF BARBARA TRUE** on the interested parties as
7    follows:

8    Michael B. Horrow, Esq.                           Attorneys for Plaintiff
     Donahue & Horrow, LLP                             Gilbert Goodman, M.D.
9    1960 E. Grand Avenue, Suite 215
     El Segundo, California  90245
10   Tel.: (310) 322-0300
     Fax: (310) 322-0302
11   mhorrow@donahuehorrow.com

12

13   ☐    **ELECTRONICALLY:** I caused a true and correct copy thereof to be
     electronically filed using the Court's Electronic Court Filing ("ECF") System and
14   service was completed by electronic means by transmittal of a Notice of Electronic
     Filing on the registered participants of the ECF System. I served those parties who
15   are not registered participants of the ECF System as indicated below.

16   ☒    I placed the ☐ original ☒ a true copy thereof enclosed in sealed envelope(s)
          to the parties listed above and caused such envelope(s) to be delivered by
17        ☒    **U.S POSTAL SERVICE**          ☐    **OVERNIGHT DELIVERY**.

18   ☐    **BY E-MAIL:** I electronically transmitted a true and correct copy thereof to the
     interested parties' electronic notification address(es) of record before close of
19   business for the purpose of effecting service and the transmission was reported as
     complete and without error.

20   ☐    **FACSIMILE TRANSMISSION:** Based on ☐ court order ☐ agreement of
21   the parties, I caused a true copy thereof to be served by transmitting via facsimile
     machine to the interested parties' facsimile number(s) of record before close of
22   business. The transmission was reported as complete, without error.

23   ☐    **PERSONAL DELIVERY:** I caused ☐ the original ☐ a true copy thereof to
     be delivered by hand to the interested parties by an employee or independent
24   contractor of a registered process service.

25        I am employed in the office of a member of the bar of this court at whose
     direction the service was made. I declare under penalty of perjury under the laws of
26   the United States of America that the above is true and correct. Executed at Irvine,
     California on November 3, 2011.

27
     NAME: Derek Sutter                               _____
28                                                    (Signature)

BARGER & WOLEN LLP
19800 MACARTHUR BLVD.
EIGHTH FLOOR
IRVINE, CA 92612
(949) 757-2800

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
Gilbert Goodman, M.D.

**DEFENDANTS**
The Lincoln National Life Insurance Company; and DOES 1 through 10, inclusive

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Michael B. Horrow, Esq. – Donahue & Horrow, LLP
1960 E. Grand Avenue, Suite 215 – El Segundo, California 90245
Telephone: (310) 322-0300; Facsimile: (310) 322-0302

Attorneys (If Known)
Martin E. Rosen, Esq.; Robert K. Renner, Esq.
Barger & Wolen LLP
19800 MacArthur Boulevard, Suite 800, Irvine, California 92612
Telephone: (949) 757-2800; Facsimile: (949) 752-6313

**II. BASIS OF JURISDICTION** (Place an X in one box only.)
☐ 1 U.S. Government Plaintiff   ☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant  ☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)
☐ 1 Original Proceeding  ☑ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No    ☐ **MONEY DEMANDED IN COMPLAINT:** $ According to proof

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Civil action between citizens of different states and amount in controversy exceeding $75,000. 28 U.S.C. §§ 1441(b) and 1446(b).

**VII. NATURE OF SUIT** (Place an X in one box only.)

OTHER STATUTES: ☐ 400 State Reapportionment, ☐ 410 Antitrust, ☐ 430 Banks and Banking, ☐ 450 Commerce/ICC Rates/etc., ☐ 460 Deportation, ☐ 470 Racketeer Influenced and Corrupt Organizations, ☐ 480 Consumer Credit, ☐ 490 Cable/Sat TV, ☐ 810 Selective Service, ☐ 850 Securities/Commodities/Exchange, ☐ 875 Customer Challenge 12 USC 3410, ☐ 890 Other Statutory Actions, ☐ 891 Agricultural Act, ☐ 892 Economic Stabilization Act, ☐ 893 Environmental Matters, ☐ 894 Energy Allocation Act, ☐ 895 Freedom of Info. Act, ☐ 900 Appeal of Fee Determination Under Equal Access to Justice, ☐ 950 Constitutionality of State Statutes

CONTRACT: ☑ 110 Insurance, ☐ 120 Marine, ☐ 130 Miller Act, ☐ 140 Negotiable Instrument, ☐ 150 Recovery of Overpayment & Enforcement of Judgment, ☐ 151 Medicare Act, ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans), ☐ 153 Recovery of Overpayment of Veteran's Benefits, ☐ 160 Stockholders' Suits, ☐ 190 Other Contract, ☐ 195 Contract Product Liability, ☐ 196 Franchise
REAL PROPERTY: ☐ 210 Land Condemnation, ☐ 220 Foreclosure, ☐ 230 Rent Lease & Ejectment, ☐ 240 Torts to Land, ☐ 245 Tort Product Liability, ☐ 290 All Other Real Property

TORTS PERSONAL INJURY: ☐ 310 Airplane, ☐ 315 Airplane Product Liability, ☐ 320 Assault, Libel & Slander, ☐ 330 Fed. Employers' Liability, ☐ 340 Marine, ☐ 345 Marine Product Liability, ☐ 350 Motor Vehicle, ☐ 355 Motor Vehicle Product Liability, ☐ 360 Other Personal Injury, ☐ 362 Personal Injury-Med Malpractice, ☐ 365 Personal Injury-Product Liability, ☐ 368 Asbestos Personal Injury Product Liability
IMMIGRATION: ☐ 462 Naturalization Application, ☐ 463 Habeas Corpus-Alien Detainee, ☐ 465 Other Immigration Actions

TORTS PERSONAL PROPERTY: ☐ 370 Other Fraud, ☐ 371 Truth in Lending, ☐ 380 Other Personal Property Damage, ☐ 385 Property Damage Product Liability
BANKRUPTCY: ☐ 422 Appeal 28 USC 158, ☐ 423 Withdrawal 28 USC 157
CIVIL RIGHTS: ☐ 441 Voting, ☐ 442 Employment, ☐ 443 Housing/Accommodations, ☐ 444 Welfare, ☐ 445 American with Disabilities - Employment, ☐ 446 American with Disabilities - Other, ☐ 440 Other Civil Rights

PRISONER PETITIONS: ☐ 510 Motions to Vacate Sentence Habeas Corpus, ☐ 530 General, ☐ 535 Death Penalty, ☐ 540 Mandamus/Other, ☐ 550 Civil Rights, ☐ 555 Prison Condition
FORFEITURE/PENALTY: ☐ 610 Agriculture, ☐ 620 Other Food & Drug, ☐ 625 Drug Related Seizure of Property 21 USC 881, ☐ 630 Liquor Laws, ☐ 640 R.R. & Truck, ☐ 650 Airline Regs, ☐ 660 Occupational Safety /Health, ☐ 690 Other

LABOR: ☐ 710 Fair Labor Standards Act, ☐ 720 Labor/Mgmt. Relations, ☐ 730 Labor/Mgmt. Reporting & Disclosure Act, ☐ 740 Railway Labor Act, ☐ 790 Other Labor Litigation, ☐ 791 Empl. Ret. Inc. Security Act
PROPERTY RIGHTS: ☐ 820 Copyrights, ☐ 830 Patent, ☐ 840 Trademark
SOCIAL SECURITY: ☐ 861 HIA (1395ff), ☐ 862 Black Lung (923), ☐ 863 DIWC/DIWW (405(g)), ☐ 864 SSID Title XVI, ☐ 865 RSI (405(g))
FEDERAL TAX SUITS: ☐ 870 Taxes (U.S. Plaintiff or Defendant), ☐ 871 IRS-Third Party 26 USC 7609

**FOR OFFICE USE ONLY:** Case Number: SACV11-01689

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                     CIVIL COVER SHEET                     Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑No ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| ORANGE | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | INDIANA |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| ORANGE | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Robert K. Kenner_ **Date** November 3, 2011

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |